(No. 34795.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LUSTER FORT, Plaintiff in Error.

*Opinion filed September 18, 1958.*

492

House and Hershey, JJ., dissenting.

Aaron H. Payne, of Chicago, for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and Benjamin S. Adamowski, State's Attorney, of Chicago, (Fred G. Leach, William H. South, Francis X. Riley, and John J. Stamos, of counsel,) for the People.

Mr. Justice Klingbiel delivered the opinion of the court:

The plaintiff in error, Luster Fort, hereinafter called defendant, was indicted in the criminal court of Cook County for the crime of forcible rape. Upon trial by jury he was found guilty, and sentence was fixed at 199 years in the penitentiary. Motions for a new trial and in arrest

of judgment having been overruled, this writ of error is prosecuted to review the record. The contentions are that the evidence is insufficient to prove guilt beyond a reasonable doubt, and that the State's Attorney made inflammatory and prejudicial remarks in his argument to the jury.

The complaining witness, a girl 15 years of age, resided with her mother in a one-room apartment on the fourth floor of a tenement or apartment-hotel building in Chicago. The room was about 17 feet by 17 feet in size and was furnished with a bed, dresser, radio combination set, television set, a couch, a large chair, a refrigerator, table and stove. The mother, Ella Mae Johnson, testified that on January 31, 1957, at 4:30 P.M. she was in the room watching television with her two daughters: Verla, the complaining witness, and Sandra, six months of age. Verla was sitting in a large chair, and her mother was sitting on the couch holding the baby. There was one door, leading from the hallway into the apartment, and the windows were located in the opposite wall. At 4:30 o'clock a buzzer sounded, indicating a call for the apartment. The telephone was located at the end of the hall outside the room, on the other side of the stairs and around a corner. The mother told Verla to answer the telephone, and Verla accordingly went out of the room, turning off the lock on the door as she left.

About a minute later a man entered the room. He held a gun in his hand, his private parts were exposed, and he wore a scarf covering the lower part of his face from the nose to the chin. He approached the foot of the bed, saying "put the baby on the bed and I mean business." The man had closed and locked the door, and stood about six feet from the witness, pointing the gun at her. She replied "there is no one at home and I don't have any money." She then arose, walked around the man and had just placed the baby on the middle of the bed when the doorknob rattled. It was Verla, returning from the telephone. The

man then stepped behind the door, unlocked it and pulled it open. As Verla started to enter he snatched her by the arm. She started screaming, whereupon he turned up the volume on the radio, and told her: "take your clothes off." He ordered the mother to lie on the floor by the television with her face down. As the witness complied she heard Verla, still screaming, fall on the bed, and heard the bed moving up and down.

The witness was lying on the floor near the foot of the bed, where she could reach up and touch it. She raised from the floor on her arm and observed the man and Verla on the bed near its foot. Verla was on her back and the man was on top of her. The witness then pulled the scarf from the man's face, whereupon he jumped up and started shooting her. She had turned over on her right side with her left hand up. A bullet hit her under the left arm about six inches, a second shot wounded her on the left shoulder, and a third struck her left elbow. She had a plain view of the man, who was standing only about a foot away, and she was looking at his face when he shot her. She did not recall much of what happened thereafter. After hearing the man go out the door, the next thing she remembered was going down the hall, helped by her daughter, who was screaming. They went to the next door apartment of one Theresa LeFlore, who then notified the police. Officers thereafter appeared and took her and Verla to a hospital, where she remained for two weeks. Ella Mae Johnson further testified that there was still daylight at the time of the occurrence; that the intruder had a thin moustache; that he wore a brown leather jacket, dark gray trousers, and a brown hat; and that the scarf was a red plaid one.

The complaining witness, Verla Johnson, testified that at about 4:30 P.M. on January 31, 1957, she went to answer the telephone in response to the buzzer, remaining out of the room about two minutes. She saw no one in the hall on her way to or from the telephone. Upon re-

turning to the room she found the door was locked, and she rattled the knob and knocked. Someone unlocked the door; and after taking about two steps she was grabbed and pulled into the room by a man with a scarf around his mouth. He wore a leather jacket, had a gun in his hand, and his privates were exposed. The witness screamed, and the intruder turned the radio up loud, telling her to get over on the bed. When she remained standing, he grabbed her by the arm, pushed her on the bed, and told her to pull off her clothes. She did nothing. He then pulled up her skirt, tore off her panties, got on top of her and engaged in sexual intercourse. When her mother reached up and snatched the scarf from his face, he jumped up and started shooting. Verla testified further that the assailant fired three shots at her mother, and then "turned toward me and shot me;" that she was shot three times: once in the right shoulder, another striking the middle finger of her right hand, and a third entering her neck on the right side. After the shooting the attacker unlocked the door and ran out of the room, whereupon Verla got up and helped her mother up. They went into the hall screaming, and observed the neighbor, Mrs. LeFlore, looking out of the door next to their room. Upon being asked what happened, they told her they had been shot. Verla was taken, with her mother, to the hospital, and remained there eight days.

Theresa LeFlore testified that on the day in question at about 4:30 P.M. she heard two shots and shortly thereafter heard screaming in the hall; that after four or five minutes she went to the door and saw Verla and Mrs. Johnson. They were bleeding. In response to her inquiries, Mrs. Johnson told her that they had been shot, that she did not know the name of the assailant and had never seen him before, and that he had tried to rape her daughter. The witness took them into her apartment and called the police.

It further appears from the evidence that on February 8 at about 9:50 P.M. officers Harris and Shelton called for Verla at her home and took her to the police station, where she viewed a lineup of six men including the defendant. She thereupon identified the defendant as the man who had committed the offense. He was wearing a leather jacket in the lineup. Officer Harris then took Verla and the defendant to the hospital where the mother, Ella Mae Johnson, was still confined. He first entered the room alone, informing Mrs. Johnson he had a man outside and wanted to know if she could identify him. He then went out and returned with the defendant handcuffed to officer Shelton. Upon seeing the defendant Mrs. Johnson exclaimed: "Oh, my God, that is the man." In the courtroom both Verla and her mother positively identified the defendant as the man who had attacked them.

Defendant did not testify in his own behalf, but introduced the testimony of his wife and several other persons in support of an alibi. Defendant's wife testified that on January 31, 1957, he left for work at about 6:20 A.M., returned home between 3:45 and 4:00 P.M., and remained in the house until the following day; that in the afternoon they received an important telephone call from a Miss Neal, in the office of a Gary, Indiana, company with whom they had been negotiating for the purchase of a home and that defendant then talked to Miss Neal on the telephone. On the following morning the witness and defendant went to Gary, Indiana, to attend to matters concerning the purchase. The witness further testified that she later went to the Gary telephone company and secured a toll statement of the telephone call made to her home on the afternoon of January 31, 1957. The statement or slip was identified and admitted into evidence. The witness testified further that on January 31, 1957, the defendant wore a leather jacket and blue jeans to work; and that he did not own any gray pants or any kind of scarf or firearm.

Two of defendant's co-workers at his place of employment testified he was present on January 31, 1957, and worked the usual shift from 7 A.M. until 3 P.M. Neither witness knew his whereabouts after 3 P.M. on that day. One Bennie Lee Allen testified that he was at defendant's home on January 31, 1957, from 4:00 P.M. until some time between 6:30 and 7:00 P.M.; that when he arrived the defendant and the latter's brother-in-law were playing checkers, and that defendant did not leave the house at any time thereafter. To the same effect is the testimony of Betty Frierson, who roomed at the home of defendant and was a friend of the family for many years, and the testimony of Zennifer Bond, brother of defendant's wife, each of whom was present during the afternoon and evening.

In attacking the sufficiency of the evidence, defendant argues that since the assailant entered the Johnson apartment almost immediately after Verla had left to answer the telephone, it is improbable that she would not have seen him in the hallway; that in view of the time of day and the large number of rooms in the building it could be expected that many people would be coming into it from work, some of whom would have noticed a person in the described condition with a gun in his hand, yet no one was produced who saw the assailant enter or leave. It is further suggested that the absence of any medical testimony supports an inference that there was no medical substantiation of the alleged rape; and Mrs. Johnson's statement to her neighbor in the hallway that the man had tried to rape her daughter is relied upon to raise a doubt the rape was consummated. The credibility of Mrs. Johnson's testimony is questioned by seeking to show she was not of high moral character. The reliability of Verla's testimony is attacked on the ground that she stated she was in the first year of high school, whereas she testified that on the day of the offense she had just finished grammar school, having graduated the preceding day. There is obviously no discrepancy

between these two statements. It is clear that the several matters urged at most merely concern the weight or credibility of the evidence and fall far short of impairing its sufficiency. There is no inherent improbability in the fact that no other persons were produced who saw the assailant. The wearing of a scarf covering the lower part of his face indicates that precautions were taken to avoid identification and detection. One intending to commit acts such as those disclosed here would naturally move stealthily and surreptitiously, and the opportunity to enter undiscovered is shown by evidence that a stairway just outside the apartment door led to the basement of the building. The fact that a rape was committed was amply proved by the testimony of the prosecuting witness and her mother. It was unnecessary, in view of this evidence, to produce medical testimony. The weight of evidence and the credibility of witnesses are questions to be determined in the first instance by the jury. The proof in this record is not so improbable or unsatisfactory as to warrant this court in disturbing the verdict.

Defendant also contends he was not properly identified because he was brought into Mrs. Johnson's hospital room handcuffed to a police officer. It is also argued that opportunity to see the man who committed the offense was insufficient because of the shooting immediately after removal of the scarf from his face, and the fact that he wore a hat during the entire occurrence. Defendant suggests that the determining factor in the prosecutrix's identification at the lineup was the leather jacket he was wearing. There is nothing in the record to support such assertion. The identification by both Verla and her mother was clear and positive, and on cross-examination remained unshaken in any important particular. The circumstances at the time of the offense afforded ample opportunity for observation. Both witnesses were within a few feet of the man when the scarf was pulled off, and each testified she looked at him and saw his face. Both the mother and the daughter positively iden-

tified the defendant eight days later and also at the trial. In addition Mrs. Johnson testified that when she saw the defendant at the hospital he had a thin moustache, and wore a brown leather jacket, a small hat and pants which looked the same as those of the intruder. There is no evidence tending to show that the identifications were induced or suggested by the police. The fact that defendant was brought alone before Mrs. Johnson for identification does not destroy her testimony but merely affects its weight. (*People* v. *Wilson*, 1 Ill.2d 178.) The evidence of identification in this record is sufficient to justify the conviction.

The defendant next insists that the testimony of his alibi witnesses shows he was home at the time of the alleged assault and rape, and could not have committed the crime; that none of the witnesses were impeached or discredited; and that a reasonable doubt of guilt is therefore raised. The testimony of defendant's wife and three other witnesses was in direct conflict with that of the prosecuting witness and her mother, with respect to his whereabouts when the crime was committed. In cases of this nature the issue is largely one of determining the credibility of the witnesses and the weight to be given to their testimony. The making of such determinations is primarily a function of the jurors, who have the opportunity to see and hear the witnesses, and this court cannot substitute its judgment for the jury's finding merely because the evidence is conflicting. (*People* v. *Wheeler*, 5 Ill.2d 474; *People* v. *Potts*, 403 Ill. 398; *People* v. *DeFrates*, 395 Ill. 439.) As we have indicated, the prosecution's eyewitnesses were likewise unimpeached and each was positive in identifying the defendant. In *People* v. *Wheeler*, 5 Ill.2d 474, 483, we pointed out that "Where there is positive identification of a defendant by credible witnesses, a guilty verdict may be sustained notwithstanding there may be otherwise uncontradicted alibi evidence and even though the alibi witnesses may be greater in number than those identifying the accused." In the

present case it is apparent that the jury, acting within the province committed to it, believed the testimony of the prosecutrix and her mother and refused to accept that of defendant's alibi witnesses. We cannot say that the verdict is based upon insufficient evidence or is contrary to the manifest weight thereof.

Defendant finally contends that the State's Attorney, in his closing argument to the jury, made inflammatory and improper remarks not based upon the evidence and having a tendency to stir passion and prejudice. In referring to defendant the prosecutor said "And that man is a rapist now. He was a rapist before and he will always be a rapist. I ask you ladies and gentlemen, who could have a bigger interest in this particular case than this defendant's wife. She's got two children to support. She will move heaven and earth to get him home to support those two children. Ladies and gentlemen, this defendant deserves no mercy. Let your verdict show these rapists, and I mean this sincerely from the bottom of my heart, let your verdict show these rapists that they cannot go about the streets of Chicago." The only objection made in the trial court is the statement of counsel for defendant that "I take exception, and ask that it be noted to the remark 'Let your verdict show these rapists.'" The court then replied "Let the record so show." It appears that the objection, if any, was confined to the specific remark referred to, and that no objection was made to preceding portions of the prosecutor's argument. The general rule is that an assignment of error will not be considered on appeal unless objection to the alleged prejudicial argument is made in the trial court and a ruling thereon is obtained. A defendant cannot ordinarily allow improper argument to be made without objection and then assign such argument as error in a reviewing court. *People* v. *Wilson*, 342 Ill. 358.

However, where the prosecutor's argument is so seriously prejudicial as to prevent the defendant from receiv-

ing a fair trial, this court may consider the assignment of error even though no objection was interposed in the trial court and no ruling was made or preserved thereon. (*People v. Moore*, 9 Ill.2d 224.) We think the remarks of the prosecutor, under the circumstances of this case, were of such a character; and that the trial court on its own motion should have intervened and directed the jury not to consider them. The statement that defendant was a rapist before and will always be a rapist finds no basis whatever in the facts in evidence in this case, nor is it founded upon a reasonable inference from proof tending to show his guilt of the present offense. It is true, as the State insists, that a prosecutor is entitled to reflect unfavorably on the defendant and to comment on his actions, if based upon competent and pertinent evidence. (*People v. Miller*, 13 Ill.2d 84.) Denouncing the defendant's wickedness and even indulging in invective, where there is support in the facts proved, do not transcend the bounds of legitimate argument. (*People v. Stephens*, 6 Ill.2d 257.) Nor is it improper to dwell on the evil results of crime and to urge a fearless administration of the law. (*People v. Caylor*, 386 Ill. 501.) But the present remarks, which imply that defendant had committed previous offenses of this character and has an inherent tendency to continue committing them, go beyond such permissible comment. They were of such character as to inflame the minds of the jurors and to leave with them the belief that defendant is a common or habitual criminal. The record contains nothing to show defendant had been a rapist in the past, nor could such fact be fairly inferred from evidence tending to show his guilt of the present offense.

In *People v. Kirkendoll*, 415 Ill. 404, a defendant was charged with forcible rape, and his defense was an alibi. It appeared that he had a previous record of crimes against property, but there was nothing to indicate he had previously been involved in a sex crime. The State's Attorney,

in his closing argument to the jury, characterized him as a "sex maniac" and "robber-rapist," and further observed that "he is a liar. There was a time in the law when a convicted felon couldn't testify." In reversing the conviction of defendant this court held that the language tended to stir passion and prejudice, and that its use constituted reversible error since the case was very close on its facts. We conclude that a similar result is required in the case at bar. The sentence imposed upon defendant was imprisonment in the penitentiary for a term of 199 years, and the evidence is in conflict on the question of his whereabouts when the crime was committed. While the identification by the prosecutrix and her mother was positive and unimpeached, the testimony of defendant's alibi witnesses as to his presence at home is contradicted only by the evidence concerning the identity of the defendant as the man who committed the crime. In such cases it cannot be disregarded. (*People* v. *Ricili,* 400 Ill. 309.) In view of the severity of the sentence and the conflict in the evidence we cannot say that defendant was not prejudiced by the unwarranted remarks of the State's Attorney.

While this court hesitates to set aside a conviction for such error alone, the very nature of cases of this kind demands the exercise of extreme care in preventing prejudicial argument which might deprive a defendant of that fair and impartial trial to which everyone, whether innocent or guilty, is entitled. (*People* v. *Anderson,* 406 Ill. 585.) Where complaint is made of remarks calculated to arouse the passions of the jurors against the defendant, the question is not whether a reviewing court may believe him innocent or guilty, but what the jury's verdict would have been had the inflammatory remarks not been made. *People* v. *McLaughlin,* 337 Ill. 259.

For the reason stated we are of the opinion that the defendant has not had a fair and impartial trial. The judg-

ment of the criminal court is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE HOUSE, dissenting:

The defendant did not properly object to the prosecutor's comments made in oral argument, but it is not necessary to decide the issue upon the technical ground that the question is not preserved. The proof showed a brutal and atrocious crime and defendant was identified as the perpetrator. The prosecuting attorney may properly refer to the evil results of crime and urge a fearless administration of the law. (*People* v. *Miller,* 13 Ill.2d 84; *People* v. *Caylor,* 386 Ill. 501.) He is also entitled to denounce the defendant as guilty of the crime charged if the evidence fairly tends to prove guilt. (*People* v. *Anderson,* 403 Ill. 128.) Comment may be made not only upon facts directly proved, but upon all those which are fairly inferable from the evidence (*People* v. *Howe,* 375 Ill. 130) and while the use of invective is not to be approved, it is not objectionable to denounce the wickedness of defendant or characterize him in an unfavorable manner if the comments are based upon the evidence. (*People* v. *Stephens,* 6 Ill.2d 257.) Tested in the light of applicable rules, and of the facts disclosed by the evidence, I am of the opinion that the remarks complained of were not of such a nature as to require a reversal of the judgment.

Where, as here, the evidence of a defendant's guilt is overwhelming, we should not use reversal and remandment as a means of chiding the prosecutor whose remarks verge on impropriety in his zeal to convict a guilty defendant.

Mr. JUSTICE HERSHEY joins in this dissent.