THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE HOLLINS, Defendant-Appellant.

Second District   No. 2—84—0227

Opinion filed August 27, 1985.

2

Daniel Yuhas and Timothy M. Gabrielson, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles R. Hartman, State's Attorney, of Freeport (Phyllis J. Perko, of State's Attorneys Appellate Service Commission, of Elgin, and Robert J. Biderman, of State's Attorneys Appellate Service Commission, of Springfield, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

On January 27, 1984, the defendant Willie Hollins, was found guilty of rape, home invasion, unlawful restraint and residential burglary after a jury trial in the circuit court of Stephenson County. On March 14, 1984, the circuit court sentenced the defendant to concurrent terms of imprisonment of 20 years for rape and home invasion and 12 years for residential burglary. The court found unlawful restraint to be a lesser included offense of rape and did not sentence the defendant on that conviction. The defendant, thereafter, filed this appeal.

The defendant, Willie Hollins, and the victim, Linda Newkirk, lived across the hall from each other in an apartment building located in Freeport. On February 4, 1983, during the afternoon hours, defendant knocked on the victim's door and asked for a cigarette. This conversation was ended by the arrival of Barb Euler, a friend of the victim. Euler left shortly thereafter, and a few minutes later the defendant again knocked at the victim's door. This time the defendant had a pack of cigarettes and asked if the victim wanted one. This conversation was also ended when Euler returned to the victim's apart-

4

ment. Euler then left the victim's apartment about a half hour later, and the defendant again returned to the victim's apartment. After a short conversation, the victim tried to close her door, but the defendant forced his way into her apartment, struck her and then raped her. Prior to leaving, the defendant told the victim that he would kill her if she ever told anyone of the rape.

The victim reported the rape to the Freeport police department, and the defendant was later arrested at his apartment. On May 27, 1983, the trial court held the defendant unfit to stand trial, finding that he could neither understand the charges against him, nor cooperate with counsel to prepare his defense. On November 28, 1983, after having been treated with Prolixin and Haldol (both antipsychotic drugs) to control his alleged delusions and hallucinations, the defendant was found fit to stand trial.

At trial, the defendant admitted the charges, but claimed that he was insane at the time of the offense. The defendant testified that he heard voices on the day of the offense, one of which the "whore of Babylon" who had control over him and made him do what he did. The defendant also presented testimony from two psychiatrists who testified that the defendant was a chronic schizophrenic and that they believed the defendant could neither appreciate the criminality of his conduct nor conform his conduct to the requirements of law on the day of the offense. The State presented testimony from three police officers and a nurse, all of whom testified that the defendant appeared and acted normally shortly after the offense. The jury rejected the defendant's insanity defense and found him guilty on all four charges. This appeal followed.

The defendant's first argument on appeal is that the State failed to prove his sanity beyond a reasonable doubt. The defendant contends that, because he introduced the opinion of two psychiatrists and the State offered only the testimony of lay witnesses, his sanity at the time of the offense had not been proven beyond a reasonable doubt.

■■ ■ The affirmative defense of insanity was codified by section 6—2(a) of the Criminal Code of 1961, which provides:

> "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1981, ch. 38, par. 6—2(a).)

While all men are presumed sane, once a defendant introduces evidence of insanity, the State must prove his sanity beyond a reasonable doubt. (*People v. Foster* (1979), 76 Ill. 2d 365; Ill. Rev. Stat. 1981, ch.

38, par. 3—2(b).)[1] The State, however, is not required to introduce expert opinion testimony on the defendant's sanity, but may satisfy its burden by other facts in evidence or the opinion of lay witnesses as to the defendant's sanity. (*People v. Young* (1978), 60 Ill. App. 3d 351.) Further, the conclusion of a defense psychiatrist on the question of sanity need not be accepted (*People v. Young* (1978), 60 Ill. App. 3d 351; *People v. Stamps* (1977), 52 Ill. App. 3d 320), and the jury may properly reach a finding of sanity by accepting lay testimony over expert testimony (*People v. Spears* (1978), 63 Ill. App. 3d 510; *People v. Kuhn* (1979), 68 Ill. App. 3d 59). Here, while the lay witnesses characterized defendant's conduct and appearance as "normal" or "calm" shortly after his arrest, none of them asked for or gave an opinion as to his sanity. Explicit lay opinion is not required where other facts in evidence support the State's burden on the insanity issue. *People v. Arnold* (1974), 17 Ill. App. 3d 1043; *People v. Greenfield* (1975), 30 Ill. App. 3d 1044; *People v. Spears* (1978), 63 Ill. App. 3d 510.

In the present case, the State presented testimony from four witnesses, Craig Mutchler (a corporal with the Freeport police department who first spoke with the defendant at his apartment and transported him to the hospital), Evelyn Hannan (a registered nurse who obtained the defendant's medical history from him at the hospital), Michael Hannan (an investigator with the Freeport police department who later interviewed the defendant), and Robert Keith (a Stephenson County sheriff's deputy who booked the defendant at the Stephenson County jail), each of whom testified that there was nothing unusual about the defendant's appearance or behavior on the night of the offense.

The State also showed that the defendant attempted to see the victim twice just prior to the rape but that these visits were interrupted by a friend of the victim. On the defendant's third visit, the victim was alone, and the defendant forced his way into her apartment and raped her. Further, after the rape occurred, the defendant threatened to kill the victim if she ever told anyone what he had done. The jury could have inferred from these facts that the defendant could control his conduct and could appreciate the criminality of his conduct. Facts tending to show a plan or design for the crime, es-

---

[1]This rule was changed by statute to place the burden of proof by a preponderance of the evidence upon the defendant. (1983 Ill. Laws 2035-36, eff. January 1, 1984.) While the present case went to trial after January 1, 1984, it is governed by the prior law because a shift in the burden of proof relating to the insanity defense would be an *ex post facto* law if applied to an offense committed prior to the change in law. *United States v. Williams* (D.C. Cir. 1973), 475 F.3d 355.

pecially for escape or concealment of the crime, have particular relevance to the question of a defendant's sanity. *People v. Spears* (1978), 63 Ill. App. 3d 510.

■ The defendant presented contrary evidence in the form of two psychiatric experts who both testified that the defendant suffered from chronic schizophrenia and that they believed the defendant could neither appreciate the criminality of his conduct nor conform his conduct to the requirements of law on the day of the offense. Examination of this testimony, however, reveals certain weaknesses. Both doctors admitted that the defendant's alleged illness could fluctuate in time and go into remission and that they had not examined the defendant until four and six months after the offense had been committed. Both doctors also testified that their opinions are based, in large part, on what the patient tells the psychiatrist and that if the defendant had lied about his symptoms it would affect the diagnosis of his alleged mental illness. Both doctors also described the defendant as extremely manipulative. The jury, therefore, may have given their opinions little or no weight.

The defendant's claim of insanity was further weakened by his admissions: (1) that he knew it was wrong to enter the victim's apartment, hit her and have sex with her against her will; (2) that when he talked to the police shortly after the offense, he did not tell them that the "whore of Babylon" had been talking to him and had control over him; (3) that while incarcerated in the Stephenson County jail from February 5, 1983, to March 2, 1983, he had an adjoining cell with his brother, who had also been arrested and was also raising an insanity defense based on demon voices or possession; and, (4) that he did not tell anyone of the voices he heard on the day of the offense and the "whore of Babylon" who allegedly controlled him until he saw Dr. Graybill in April of 1983. From these admissions the jury could have inferred that the defendant made up his symptoms of insanity after talking to his brother.

A finding of sanity will not be disturbed on appeal unless it is so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's sanity. (*People v. Carlson* (1980), 79 Ill. 2d 564.) In light of the evidence presented in this case, it cannot be said that the jury's finding of sanity is "so improbable or unsatisfactory as to raise a reasonable doubt."

■ The defendant's next argument on appeal is that the jury's finding of sanity was based on passion or prejudice caused by improper questions and remarks by the prosecutor which stated facts not in evidence and amounted to the prosecutor giving testimony. The

defendant addresses three specific instances.

First, the prosecutor asked Dr. D'Souza:

> "PROSECUTOR: And Doctor, do you consider, would you consider it significant if you knew that the first time the defendant stated that he heard voices was to Dr. Graybill in April of 1983, two and a half months after he was arrested?"

The prosecutor also asked Mr. Hammel:

> "PROSECUTOR: Doctor, at that time were you also, at the time you formed your opinion and prior to testifying today were you aware that on the date of February 4, 1983 the defendant did not tell any police officer that he was hearing voices on *that day*?" (Emphasis added.)

The defense argues that these were improper because the record shows that the defendant had reported hearing voices prior to February 4, 1983.

It is clear from the record that the defendant claimed to have heard voices as early as August of 1978 when the defendant told Hugh Knapp, a counselor at the Jane Adams Community Mental Health Center, that he was hearing voices of a religious nature telling him to touch women. The defendant also told Officer Hannan of such voices shortly after the rape. It is also clear from the record, however, that the defendant did not tell Officer Hannan, or anyone else prior to Dr. Graybill in April of 1983, that he heard any voices, including the "whore of Babylon," on the day of the offense or that it was the "whore of Babylon" that had control of him on that day. The defendant, in fact, admitted this on cross-examination.

In light of this evidence, the first question asked of Dr. D'Souza might be construed as misleading because it did not distinguish between the voices the defendant claimed to have heard prior to the offense and those he claimed to have heard on February 4, 1983. Any possible prejudice to the defendant, however, was eliminated by the defense objection to the question of this same ground, stating:

> "DEFENSE COUNSEL: Your honor, that is not true, the police officer testified concerning the defendant's comments about the voices, about a voice.
>
> PROSECUTOR: Your honor, Officer Hannan testified that the defendant said that he only had sex when he heard voices or when the Spirit moved him.
>
> THE COURT: And the question was, did the defendant, to the officer, did the defendant tell you that he heard voices that night telling him to rape Linda Newkirk and he said, no, he did not, that is the Court's understanding, I would overrule the ob-

jection.

Q. Doctor, were you aware that the first time the defendant had ever stated to anyone that he heard these voices telling him to do this was two and a half months after the commission of the offense when talking to Doctor Graybill?"

■ As to the second question asked of Dr. Hammel, this was a proper question since it did distinguish between the voices the defendant claimed to have heard prior to the offense and those he claimed to have heard on the day of the offense and was clearly referring to the defendant's admitted failure to tell the police of the voices he allegedly heard just prior to the rape.

■ Similarly, the defendant argues he was prejudiced by the prosecutor's questions to both Dr. D'Souza and Dr. Hammel asking if they were aware, at the time they formed their opinion, that the defendant had been confined with his brother who had also been arrested for attacking a woman and was also claiming an insanity defense. Again, the defendant argues that there was no basis for the questions and that they amounted to testimony by the prosecutor.

The prosecutor's interrogation, however, was grounded on the defendant's own prior admissions. On cross-examination the defendant had stated:

"Q. And isn't it true that your brother, Matthew Whitley had the adjoining cell right next to you until March 2nd, from February 5, 1983, until March 2nd, 1983?

A. Yes, sir.

Q. And you and Matthew would be able to talk back and forth; wouldn't you?

A. Yes, sir.

Q. And at that time wasn't Matthew saying in raising the insane defense that he heard demon voices?

A. Yes, sir.

Q. That told him to attack a woman?

A. I don't know, he didn't say anything about demon voices, but he said that he was possessed.

Q. And he told you that?

A. Yes, sir."

The prosecutor's questions, therefore, were not improper.

■ The defendant lastly complains of the prosecutor's statement in closing argument:

"He first denied and then he later gradually admitted what he had done. You heard Officer Hannan say that it's not unusual in his experience for a defendant to first deny having commit-

ted a crime and then gradually admit that he did commit the crime."

The defendant argues that Officer Hannan's testimony was to the contrary, that it was unusual for a defendant to repeatedly and substantially change his story as this defendant did, and that the State's misstatement of Officer Hannan's testimony to imply the sanity was prejudicial.

Officer Hannan testified that the defendant's statements were unusual because he gave several substantially different stories on whether he had sexual relations with the victim, and, if so, whether it was consensual or whether it was in his or the victim's apartment. Hannan also stated that it was not unusual for a person to first deny an offense and then to later admit the act. The prosecutor's closing argument referred only to this latter portion of Hannan's testimony and, therefore, did not actually misstate that testimony. Whether the prosecutor's reference to Hannan's testimony could have been misleading as taken out of context, however, appears to be a close question.

The defendant did not object to the prosecutor's comment during closing argument. The general rule is that an assignment of error will not be considered on appeal unless an objection was made at trial to the alleged prejudicial argument. A defendant cannot ordinarily allow an improper argument to be made without objection and then assign it as error in a reviewing court in order to obtain a second trial when the error might have been prevented or corrected at the first trial. (*People v. Fort* (1958), 14 Ill. 2d 491; *Bleich v. People* (1907), 227 Ill. 80.) Courts of review, however, will review the argument to ascertain if it was so seriously prejudicial that it deprived the defendant of a fair trial. *People v. Fort* (1958), 14 Ill. 2d 491.

In the present case, Officer Hannon stated, both on direct and cross-examination, that he considered the defendant's repeated and substantial changes in his story to be unusual. The jury was also instructed that the closing arguments were not evidence and that any statements made by the attorneys which were not based on the evidence should be disregarded. Therefore, the prosecutor's argument, if it was misleading at all, did not deny the defendant a fair trial.

█ The defendant's third argument on appeal is that the State failed to comply with the material witness role. The material witness rule states that when the voluntary nature of a confession is brought into question by a motion to suppress, the burden is on the State to prove that the confession was voluntarily given and the State must produce all material witnesses connected with the taking of the state-

ments or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471.) It is undisputed that the State failed to produce Assistant State's Attorney Michael Bald at trial, even though Bald was presented during Officer Hannan's questioning of the defendant.

Before the material witness rule becomes applicable in a criminal prosecution, the defendant must question the voluntariness of the confession or his failure to do so waives the issue. (*People v. Terrell* (1975), 62 Ill. 2d 60; *People v. French* (1965), 33 Ill. 2d 146.) In the instant case, the defendant argues that he did object when Officer Hannan attempted to testify as to what the defendant told him and that, while the ground for this objection was not clearly stated, this court should infer that the ground was voluntariness because that was the only possible ground to suppress the statement.

It is clear from the record, however, that the defendant made no motion, verbal or written, to exclude his statement to Officer Hannan on the grounds of voluntariness or upon any other ground. When Officer Hannan attempted to testify as to what the defendant told him, defense counsel objected and stated that the reason was the same as that raised earlier in chambers. In the earlier conference defense counsel had stated:

> "And I would point out to the Court then that the Court ruled yesterday in a motion filed by the Prosecutor that an examining physician cannot testify based in part upon what the particular patient or person told him. Because of that ruling I have *not* filed a motion to suppress the statements made by the defendant to police in custody. Based on the Court's judgment and decision in response to the motion it appeared to me that the defendant because of the ruling of the Court would have to take the Court and as such the statements that he made to the police could probably be used if directly suppressable could properly be used to impeach the testimony of the defendant concerning his recollections as far as what happened. Because of that the motion to suppress had *not* been filed and I would like the record to be clear that that is the reason why I asked as court appointed counsel, did ont file a motion." (Emphasis added.)

The record shows, therefore, that the defendant did not move to suppress the confession on any ground and that his alleged objection simply referred back to his earlier statement as to why he did not move to exclude the defendant's statement. Further, the defendant does not argue on appeal that his failure is in any way excused by the court's earlier ruling or that the earlier ruling was incorrect. The

defendant has therefore waived this issue.

For the reasons stated above, the judgment of the circuit court of Stephenson County is affirmed.

Affirmed.

NASH, P.J., and HOPF, J., concur.