THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DOUGLAS HICKMAN, Defendant-Appellant.

Fifth District    No. 5—84—0250

Opinion filed May 9, 1986.

Randy E. Blue, of State Appellate Defender's Office, of Mt. Vernon, and Douglas Hickman, of Menard, *pro se*, for appellant.

Kenneth R. Boyle, Stephen E. Norris, and John H. Benham, all of State's Attorneys Appellate Service Commission, of Mt. Vernon, for the People.

PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Richland County, defendant, Douglas Hickman, was convicted of the offense of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)). Defendant was sentenced to an extended term of imprisonment of 50 years (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—5—3.2(b), 1005—8—2(a)(1)) and subsequently perfected the instant appeal.

Court-appointed appellate counsel filed a brief on defendant's behalf in the case at bar. In addition, this court granted defendant's request to file a *pro se* brief. The following issues are presented for review: (1) whether the State failed to prove defendant's sanity beyond a reasonable doubt; (2) whether the trial court erred in admitting into evidence certain allegedly involuntary statements made by defendant; (3) whether defendant was denied his right to effective assistance of counsel; (4) whether the trial court erred in sentencing defendant to an extended term of imprisonment of 50 years. We affirm.

The record contains the following undisputed evidence. During the afternoon of October 13, 1983, defendant, who was 34 years of age at the time of the trial, telephoned his former wife, Ann Hickman, and they agreed that they would have dinner together that evening. After defendant drove to Ms. Hickman's house and picked her up at approximately 6:45 p.m., they stopped at a restaurant to purchase food and returned to his apartment where they planned to spend the evening watching television. Later in the evening, defendant and Ms. Hickman disrobed and went into an upstairs bedroom. At that point, defendant

strangled Ms. Hickman until she was dead. Defendant then telephoned certain individuals, stating that he had killed his former wife. One of these individuals telephoned an Olney police officer and related the details of her conversation with defendant. When three Olney police officers arrived at defendant's apartment at approximately 10:30 p.m., defendant informed them that Ms. Hickman was dead. After defendant consented to their request to search the premises, the officers observed Ms. Hickman's dead body lying in an upstairs bedroom.

Although defendant did not deny during the trial that he killed Ms. Hickman, he asserted that he was insane at the time of the offense. The jury, which was instructed that the State bore the burden of proving beyond a reasonable doubt that defendant was sane, rejected the insanity defense and found the defendant guilty of murder.

■ Defendant initially argues on appeal that the State failed to prove his sanity beyond a reasonable doubt. Before examining the merits of this issue, however, we must address the State's argument that defendant had the burden of proving by a preponderance of the evidence that he was insane and that the jury was improperly instructed that it was the State's burden to establish that defendant was sane at the time of the offense.

The affirmative defense of insanity was codified by section 6—2(a) of the Criminal Code of 1961, which provides:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(a).)

Prior to a 1984 amendment of section 6, when a defendant introduced evidence of insanity, the State was required to prove his sanity beyond a reasonable doubt. (*People v. Hollins* (1985), 136 Ill. App. 3d 1, 4, 482 N.E.2d 1053, 1055.) However, on January 1, 1984, Public Act 83—288 added section 6—2(e) to the Code (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(e)). This provision places the burden of proof upon a defendant to prove by a preponderance of the evidence that he is not guilty by reason of insanity.

We recognize that the trial in the instant case commenced after January 1, 1984. Nevertheless, we reject the State's assertion that defendant bore the burden of proving his insanity by a preponderance of the evidence. A shift in the burden of proof relating to the insanity defense would be an *ex post facto* application of the statute if applied to the trial for an offense which was committed prior to the amendment to the law, such as in the instant case. (*People v. Hollins* (1985),

136 Ill. App. 3d 1, 5, 482 N.E.2d 1053, 1055.) Furthermore, it was the State who tendered the jury instruction concerning the insanity defense in this case. Accordingly, we conclude that the State has waived its right to challenge the propriety of this instruction on appeal.

The following evidence was introduced concerning the insanity defense. Dr. David Siddens, a clinical psychologist who had briefly treated defendant prior to October 1983, testified that following the incident he or a member of his staff interviewed defendant for a total of approximately 30 hours, interviewed various members of defendant's family, and administered certain psychological tests to defendant. Based on these interviews and tests, Dr. Siddens diagnosed defendant as suffering from "paranoid schizophrenia, or paranoid psychosis." According to Dr. Siddens, a computer analysis of a certain test which Dr. Siddens administered to defendant indicated that defendant suffered from "alcoholism with psychotic organic brain syndrome" and was a "psychosis schizophrenia paranoid type with aggressive hostile behavior." Dr. Siddens explained that defendant's psychosis was "atypical" because he exhibited only four of the six criteria of schizophrenia.

Dr. Siddens testified as follows concerning defendant's mental illness. The illness commenced when defendant's mother emotionally abandoned him on or about his second birthday, September 30, 1951. This abandonment resulted from the severe emotional depression experienced by his mother following the deaths of defendant's handicapped infant brother and his maternal grandfather. As a result of his mother's conduct, defendant unconsciously developed inwardly directed feelings of rage toward his mother.

Defendant's mother became more depressed and relied primarily on defendant for emotional support following the 1975 suicide of defendant's father. On or about October 13, 1982, doctors determined that defendant's mother was suffering from amytrophic lateral sclerosis. His mother's condition steadily deteriorated until her death in July 1983.

Dr. Siddens further stated that in the period immediately prior to October 13, 1983, defendant became "more agitated" and his "thinking, reasoning, functioning, and mental balance became more *** disturbed." According to Dr. Siddens, on that date, which was one year after defendant had learned that his mother was dying, defendant, acting out the "rage of a two-year old child," strangled Ms. Hickman. Dr. Siddens stated that in strangling Ms. Hickman, defendant was actually, albeit unconsciously, killing three individuals at one time: (1) his infant brother, whose death had led to the initial emotional abandon-

ment by his mother; (2) his father, whose death had caused further abandonment; and (3) his mother, whose death was the final abandonment.

Dr. Siddens concluded that due to this mental disease, defendant was without substantial capacity to either appreciate the criminality of his actions or conform his conduct to the requirements of the law at the time he killed Ms. Hickman.

Phillip Novack, one of defendant's co-workers, testified as follows: During the approximately six-week period prior to October 13, 1983, defendant had experienced a "change in attitude" and was depressed. Approximately one week prior to October 13, defendant informed Novack that defendant had "Plan A and Plan B." Under plan A defendant was going to travel to Africa. Although he did not explain "Plan B," defendant stated that (1) Novack "should be able to figure it out," (2) Novack "would be the first that they would come and see," and (3) "whoever would come would ask [Novack] if [defendant] seemed any different or strange." Defendant told Novack on October 13 that defendant "was going to turn Olney on its ears."

Two of defendant's co-workers testified that on October 13 defendant told them that they would have "plenty to talk about tomorrow." Two of defendant's other acquaintances testified that during the period immediately prior to October 13 he appeared "emotionally drained" and was "hopeless with life."

Dr. Siddens' receptionist testified that defendant came to Dr. Siddens' office on October 13 to inform her that the electricity in the office would be temporarily turned off so that defendant's electrical crew could perform certain work. The receptionist recognized that defendant was one of Dr. Siddens' former patients, observed that defendant was "depressed" and "very upset," and offered to make an appointment for defendant to see Dr. Siddens. Defendant refused, stating to her that "nobody cared anyway."

Certain Richland County jailers testified that during the first six weeks of his incarceration, defendant appeared "dazed" and slept most of the time. One jailer stated that although defendant was initially "a long way from being with the rest of us" and was "not in tune with life," defendant appeared "to be coming out of it" after approximately six weeks of confinement.

Dr. Werner Tuteur, a psychiatrist certified by the American Board of Psychiatry and Neurology since 1951, examined defendant in February 1984 for a total of approximately 2½ hours and testified as follows: Dr. Tuteur stated that defendant described to him in detail the events surrounding Ms. Hickman's death. Based on his interviews

with defendant, Dr. Tuteur concluded that at the time of the incident defendant was not suffering from a mental disease and defendant was able to appreciate the criminality of his conduct and conform his conduct to the requirements of the law.

In the instant appeal, defendant admits that conflicting evidence was introduced concerning his sanity at the time of the incident. However, defendant asserts that, considering all of the foregoing evidence, the State failed to prove his sanity beyond a reasonable doubt.

■ Whether the State carried its burden of proving defendant's sanity beyond a reasonable doubt is a question of fact, and the jury's determination will not be reversed unless it is so improbable or unsatisfactory as to create a reasonable doubt as to the defendant's sanity or so palpably erroneous as to suggest its basis is passion or prejudice. *People v. Silagy* (1984), 101 Ill. 2d 147, 169, 461 N.E.2d 415, 425-26.

■ After considering the record, we conclude that the evidence presented at trial supports the jury's decision that the State satisfied its burden of proving that defendant was sane at the time of the offense. Although Dr. Siddens testified that defendant was suffering from an "atypical psychosis," Dr. Tuteur testified that defendant was not incapacitated by a mental disability to such a degree that he was deprived of substantial ability to understand the nature of his actions or to conform his conduct to the requirements of the law. In fact, Dr. Tuteur stated that defendant's accurate recollection of the events surrounding the offenses "ruled out" the presence of any mental disease or psychosis at the time of the offense.

Dr. Tuteur's testimony also indicates that defendant was aware of his actions and able to appreciate the criminal nature of his conduct. For example, after strangling Ms. Hickman in the darkened upstairs bedroom, defendant repeatedly checked her body for signs of life by listening for a heartbeat and shining a penlight, which he had obtained from another room, into her eyes. Dr. Tuteur stated that defendant's conduct with respect to the penlight was quite rational because defendant could not have determined whether Ms. Hickman was dead merely by turning on the ceiling light in the bedroom. After determining that she was dead, defendant telephoned various individuals, stating that he had killed his former wife. Dr. Tuteur testified that these phone calls constituted a rational attempt by defendant to alleviate the guilt that he had experienced following Ms. Hickman's death.

Defendant notes that Dr. Tuteur based his diagnosis as to defendant's mental condition at the time of the October 1983 offense on two

February 1984 interviews with defendant which lasted a total of approximately 2½ hours. Defendant maintains that Dr. Tuteur's diagnosis is unreliable because defendant's mental condition could have improved between October 1983 and February 1984. However, in response to a question concerning this potential change in defendant's mental condition, Dr. Tuteur testified that (1) if defendant had been psychotic at the time of the offense, his condition would have worsened due to his confinement in jail, and (2) defendant exhibited no signs of mental illness during the February 1984 interviews.

Moreover, Dr. Tuteur's diagnosis is consistent with the testimony of certain other witnesses concerning defendant's behavior prior to the offense. For example, approximately one week prior to the incident, defendant refused to explain his "Plan B" but told a co-worker that certain, unspecified individuals would ask the co-worker if the defendant "seemed any different or strange." In addition, on the day before the incident, defendant repeatedly informed his co-workers that "they would have something to talk about tomorrow" and that defendant was "going to turn Olney on its ears." The jury properly could have inferred from the foregoing testimony that defendant had planned the offense in advance and had contemplated the consequences of his actions. The existence of a plan or design for a crime is relevant to the issue of a defendant's sanity. See *People v. Meeker* (1980), 86 Ill. App. 3d 162, 168-69, 407 N.E.2d 1058, 1064.

In this case, the jury heard all of the testimony and was apprised not only of Dr. Siddens' and Dr. Tuteur's qualifications but also of the factors each expert used in making his diagnosis. It is within the discretion of the trier of fact to accept one expert's opinion over another's on the question of sanity so as to resolve contradictions. (*People v. Alerte* (1983), 120 Ill. App. 3d 962, 968, 458 N.E.2d 1106, 1111, *cert. denied* (1985), 469 U.S. 1105, 83 L. Ed. 2d 773, 105 S. Ct. 777.) Here, the jury's decision to accept Dr. Tuteur's diagnosis, which was supported by the testimony of other witnesses, did not constitute an abuse of discretion.

In his *pro se* brief, defendant notes that the following evidence was introduced at trial. Two of the three Olney police officers who were dispatched to defendant's apartment at approximately 10:30 p.m. on October 13, testified that when they arrived defendant told them that he "had taken Tranzene for his nerves." Defendant consented to their request to search the premises and the officers discovered Ms. Hickman's body. The officers then informed defendant of his *Miranda* rights. After defendant indicated that he understood these rights, the officers asked defendant how he had killed the victim and

defendant replied, "I strangled her I guess. I don't know."

One officer testified that the defendant appeared "dazed" when the officers arrived. Another officer stated that although defendant appeared a "little dazed" and a "little nervous," he knew "what was going on" and understood the questions that the officers asked him. The third officer observed defendant at his apartment, transported defendant to an Olney hospital where defendant was given a substance "to induce vomiting," and transported defendant to the Olney police department and to the Richland County jail. This officer testified that throughout this period defendant was "coherent," "very cooperative," acted "normally," did not appear "dazed," and engaged in "normal conversation" with the officer.

A Richland County jailer testified that he attempted to obtain defendant's fingerprints at approximately 11:30 p.m. on October 13 but was unable to do so because defendant was "unsteady" and fell to the floor on two occasions.

The Olney police chief testified that after informing defendant of his *Miranda* rights, he interrogated defendant at approximately 12:10 a.m. on October 14. Although defendant appeared "nervous," his conduct was "ordinary" and he stated that he understood his *Miranda* rights. In response to questioning, defendant stated that he "intended to kill [Ms. Hickman] before picking her up" on October 13. Without elaborating on the foregoing statement, defendant terminated the interrogation by requesting to speak to an attorney and to Dr. Siddens.

■ Defendant maintains that his statement to members of the Olney police department were made involuntarily while he was under the influence of the drug Tranzene and should not have been admitted into evidence. However, where, as here, a defendant fails to object to the introduction into evidence of an inculpatory statement, the introduction of such a statement without preliminary proof of voluntariness is proper and not open to review. *People v. Hicks* (1970), 44 Ill. 2d 550, 553, 256 N.E.2d 823, 825.

Defendant argues, however, that the plain error doctrine should be invoked in the instant case (87 Ill. 2d R. 615(a)). In order for a court of review to invoke the plain error doctrine, the evidence must be closely balanced or the error must be of such a magnitude that an accused is denied a fair and impartial trial. (*People v. Gacy* (1984), 103 Ill. 2d 1, 28, 468 N.E.2d 1171, 1181, *cert. denied* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410.) In the case at bar, defendant relied solely on an insanity defense. We previously have concluded that the evidence in this case was sufficient to support the jury's decision that defendant was sane beyond a reasonable doubt at the time he

killed Ms. Hickman.

■ Furthermore, the record does not support defendant's contention that his statements to the police officers were made involuntarily. For example, although defendant was transported to a hospital and given a substance to induce vomiting, the record is unclear as to the amount of the drug Tranzene that he had ingested and the effects of that drug on defendant. Certain Olney police officers testified that defendant appeared "dazed" and a "little nervous" shortly after the incident, and a Richland County jailer was unable to obtain defendant's fingerprints because defendant was "unsteady." However, the police officer who initially observed defendant at his apartment and subsequently transported him to the hospital and to the jail testified that defendant was "coherent," "very cooperative" and engaged in "normal conversation" with the officer. Each of the officers who interrogated defendant testified that defendant acknowledged that he understood his *Miranda* rights. In addition, defendant terminated the interrogation conducted by the Olney police chief by requesting to talk to an attorney and to a psychologist. After considering the record, we find no reason to invoke the plain error doctrine in the case at bar.

Alternatively, defendant argues in his *pro se* brief that trial counsel's failure to object to the admission of his statements to the Olney police officers constituted ineffective assistance of counsel. In support of this argument, defendant relies on the case of *Lufkins v. Solem* (8th Cir. 1983), 716 F.2d 532, *cert. denied* (1984), 467 U.S. 1219, 81 L. Ed. 2d 372, 104 S. Ct. 2667.

The *Lufkins* court determined that trial counsel's ineffectiveness, including his failure to request an independent hearing as to the voluntariness of defendant's incriminating statement, so prejudiced defendant's right to a fair trial as to entitle him to a new trial. (*Lufkins v. Solem* (8th Cir. 1983), 716 F.2d 532, 541-42.) However, the *Lufkins* case may be distinguished from the instant case. There, the court concluded that while a reasonably competent attorney is not required to pursue a procedural alternative having little or no likelihood of success, the defendant's voluntariness challenge could not have been fairly regarded as having little or no likelihood of success (716 F.2d 532, 541.) As we previously have stated, it is our conclusion that the record in the instant case does not support defendant's contention that his statements were made involuntarily.

■ We also recognize that the decision not to move to suppress evidence is one involving trial strategy and therefore outside the scope of review for purposes of establishing incompetency of counsel.

(*People v. Borges* (1984), 127 Ill. App. 3d 597, 604, 469 N.E.2d 321, 327, *cert. denied* (1985), 470 U.S. 1057, 84 L. Ed. 2d 829, 105 S. Ct. 1768.) This is especially true where, as here, defendant relied solely on the defense of insanity. Accordingly, we reject defendant's contention that he was denied effective assistance of counsel.

■ Defendant also contends that the trial court erred in sentencing him to an extended term of imprisonment of 50 years. In his *pro se* brief, defendant contends that a trial court may not impose an extended term of imprisonment if it finds that defendant's character and attitude indicate that he would be unlikely to commit another crime. Defendant argues that his extended-term sentence must be vacated because the trial court made such a finding during the sentencing hearing in the instant case.

We initially note that it is unclear from the relevant portion of the sentencing hearing transcript whether the trial court made such a finding or was merely reciting one of the factors in mitigation found in section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.1(a)(9)). In any event, the case upon which defendant relies in support of his argument, *People v. Merz* (1984), 122 Ill. App. 3d 972, 461 N.E.2d 1380, may be distinguished from the case at bar. The *Merz* court determined that such a finding is "incompatible with the statutory requirement that the court be of the opinion that a consecutive sentence is necessary to protect the public from further criminal conduct by the defendant." (122 Ill. App. 3d 972, 981, 461 N.E.2d 1380, 1387; Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(b).) Here, the trial court sentenced defendant to an extended term of imprisonment under sections 5—5—3.2(b) and 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, pars. 1005—5—3.2(b), 1005—8—2). There is no requirement in these sections that a trial court find that a defendant's character and attitude indicate that he is likely to commit another crime before it may sentence a defendant to an extended term of imprisonment.

Defendant next asserts that his extended-term sentence must be vacated because the trial court erred in determining that the instant offense was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2).) We disagree.

Section 5—5—3.2(b)(2) of the Code does not require, as a prerequisite to finding that the defendant's behavior was brutal or heinous, a showing that torture or unnecessary pain was inflicted upon the victim. Although a single act which causes death or injury may be sufficient to demonstrate the existence of wanton cruelty, a court, in evalu-

ating the brutality or heinousness of a defendant's conduct, must consider all of the factors surrounding the incident in question. *People v. Nester* (1984), 123 Ill. App. 3d 501, 504-06, 462 N.E.2d 1011, 1014-15.

Another factor in determining whether a defendant's conduct is indicative of wanton cruelty is whether the offense is premeditated and committed with cold-blooded deliberation. (*People v. Nester* (1984), 123 Ill. App. 3d 501, 505, 462 N.E.2d 1011, 1014-15.) Here, defendant repeatedly informed his co-workers on the day of the incident that he was going to "turn Olney on its ears" and that they would have "something to talk about the next day." Moreover, approximately one week prior to the incident, defendant formulated "Plan A and Plan B." Pursuant to the unexecuted plan A, defendant was going to work in Africa. Although defendant stated during the sentencing hearing that he was going to kill himself pursuant to plan B, defendant informed Dr. Siddens that "Plan B was to kill [Ms. Hickman] and kill himself." On October 13, defendant called Ms. Hickman, arranged to meet her that evening, picked her up at her house, took her to his apartment and went with her to his bedroom where he smothered and strangled her to death. Defendant then repeatedly checked her body for signs of life.

Defendant submits that his actions constituted an outburst of unconscious rage—not an outburst of wanton cruelty. As we previously have determined, the jury properly could have found that defendant was sane beyond a reasonable doubt at the time he killed Ms. Hickman. Accordingly, we conclude that defendant's actions indicate that he planned the murder and committed it with cold-blooded deliberation.

A defendant's subsequent demonstration of remorse for his conduct or a lack of a penitent spirit is a factor which must also be considered in determining whether a defendant's conduct is indicative of wanton cruelty. (*People v. Nester* (1984), 123 Ill. App. 3d 501, 506, 462 N.E.2d 1011, 1015.) Here, defendant repeatedly checked Ms. Hickman's body in an attempt to determine whether she was dead—not in an attempt to administer aid to her. In addition, although defendant stated during the sentencing hearing that he was "sorry" for his crime, he also stated to Dr. Siddens that (1) it was not "fair" that he was going to be tried for the offense, and (2) if he "would have run over [Ms. Hickman] in a car nobody would have cared." Defendant's statement to Dr. Siddens indicates that defendant experienced remorse for the potential consequences of his actions—not for his criminal conduct.

We conclude that the trial court did not abuse its discretion in

sentencing defendant to an extended term of imprisonment.

Defendant's final contention is that assuming *arguendo* that he was properly sentenced to an extended term, his sentence must be reduced to the minimum extended term due to the absence of significant aggravation factors and the presence of significant mitigation factors. Specifically, defendant argues that the trial court erroneously considered, as an aggravation factor in imposing sentence, that defendant caused "serious bodily injury." Defendant asserts that this factor is present in every case involving murder. Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(1); see *People v. Conover* (1981), 84 Ill. 2d 400, 405, 419 N.E.2d 906, 909.

In *People v. Andrews* (1982), 105 Ill. App. 3d 1109, 1112-13, 435 N.E.2d 706, 708, we rejected a similar contention and concluded that when sentencing a defendant convicted of murder, a trial court properly may consider the force employed and the physical manner in which the victim's death occurred.

In the instant case, after determining that defendant should be sentenced to an extended term for the murder of Ms. Hickman, the trial court was required to sentence defendant to a term of "not less than 40 years and not more than 80 years" imprisonment (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)(1)). After considering the evidence of record, including the premeditated nature of defendant's actions and the manner in which Ms. Hickman's death occurred, we conclude that the trial court did not abuse its discretion in sentencing defendant to an extended term of imprisonment of 50 years.

For the reasons stated herein, we affirm the judgment entered by the circuit court of Richland County.

Affirmed.

JONES and WELCH, JJ., concur.