THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACKIE L. GANDY, Defendant-Appellant.

Fifth District   No. 5—89—0869

Opinion filed April 13, 1992.

114

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Paul Hillis, Jr., State's Attorney, of Salem (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

The appeal before this court is a consolidation of defendant Jackie L. Gandy's direct appeal from the judgment of the circuit court of Marion County finding defendant guilty of the murder of Clarence Eugene Wilson and the sentence imposed therein, and defendant's appeal of the circuit court's order dismissing defendant's post-conviction relief petition. For reasons stated as follows, we affirm both the November 15, 1989, judgment and the November 30, 1990, order of the circuit court.

Defendant was first indicted by the grand jury in Marion County on September 9, 1988, and charged with the first-degree murder of Clarence Eugene Wilson. Because the murder was alleged to have been committed sometime between June 26 and June 28, 1983, a date which preceded the effective date of the statute delineating the felony offense of first-degree murder, defendant was later charged by information with the offense of murder under count II of the criminal complaint. The State dismissed count I and proceeded to trial on the count II charge of murder. Following a bench trial which was held on November 13-15, 1989, defendant was found guilty of murder as charged in count II of the criminal complaint, judgment was entered on the finding of guilt on November 15, 1989, and defendant was sentenced on December 22, 1989, following a sentencing hearing, to an extended term of 50 years' imprisonment. Because defendant raises issue, *inter alia*, with the sufficiency of the State's evidence and lack of credibility of the State's main witness, we shall first set forth a summary of the testimony and evidence admitted in this bench trial.

Ralph Unverfhert testified that in 1983 he owned farmland in Marion County just north of County Line Road. Unverfhert testified that on August 10, 1983, he discovered a skull and some dentures approximately 15 feet away from the skull. He testified that wheat had been harvested around July but that the field had been planted in beans at the time the skull was discovered. Unverfhert contacted the authorities, and thereafter he and someone from the county coroner's office discovered a forearm located about 125 feet from the skull.

Bill Culbreth, deputy coroner of Marion County, testified that two to three days after the skull was discovered he and another investigator discovered the remains of a body in a clump of trees located at

the corner of Unverfhert's field, about 15 to 20 feet north of County Line Road. Unverfhert opined that the acre-sized plot of trees and bushes, positioned at the intersection of County Line Road and Route 350, was fairly dense and the body could not have been seen from the road. Culbreth identified photographs of the remains and the crime scene.

Daniel Fischer, Marion County coroner, testified that there was a large hole and a splitting of the skull near the midline of the forehead region of the skull. Fischer testified that in addition to the skull, a lower jaw, upper and lower dentures, hair material, two vertebrae and an arm bone were located in the field and that he had requested that Dr. Steven Nurenberger, a forensic pathologist for Marion County, examine these items along with the skeletal remains found in the clump of trees. Fischer also testified that as they were in the process of moving the body from the crime scene, a metal hip prosthesis fell from the body. It was by tracing the hip prosthesis that the authorities were later able to identify the victim as Clarence Eugene Wilson.

Dr. Nurenberger identified the remains as human and belonging to the same individual. Dr. Nurenberger opened the skull and recovered a spent slug embedded in the tissue and dried blood at the back of the skull. The hole and splitting of the skull were consistent with a contact gunshot wound in which the muzzle of a weapon is tightly pressed against the forehead of the victim, and the finding of a spent slug in the skull confirmed a gunshot wound to the head. The contact wound to the head would likely have been fatal and could have been the cause of death. Dr. Nurenberger opined that the victim was male, and although he could not fix the date of death, he stated that the victim had been dead for a period greater than weeks. Dr. Nurenberger also identified fracturing of a lower left rib and sixth or seventh thoracic vertebral body. These injuries were consistent with a gunshot wound to the back at that location, transversing the rib in a horizontal to slightly downward angle. Dr. Nurenberger opined that this wound could also have been a fatal one, without immediate surgical intervention.

Richard Caudell examined the body and the crime scene on August 12, 1983, and located a bullet lying under the body. The decedent had been wearing blue jeans and underpants but no shirt when the body was found. The blue jeans were fastened at the waist, but the pants were unzipped. It had appeared that animals had gotten to the body and could have dragged the skull and portions of the arm 70 to

80 yards from the rest of the body. The hip prosthesis was turned over to Agent Guerin.

Michael Kreiser, forensic scientist with the Illinois State Police, testified that the two slugs were both fired lead bullet, .38 caliber. This type of bullet can be found in cartridges such as .38 Special or .357 Magnum or .38 S & W, and these two slugs may have been fired from the same gun, a Colt, Eig or Miroki revolver. Defendant stipulated that the body found on or about August 10, 1983, was that of Clarence E. Wilson and that Wilson's death was caused by gunshot.

Clifford Tony Dyer, the State's main witness, received immunity for his testimony, to the extent that the State would not prosecute him for the murder of Clarence E. Wilson unless it obtained some evidence that it was Dyer who had actually shot the victim. Dyer testified that he, Wilson and Gandy were associated as partners in crime for a period of two to three months during 1983. The three went south to Tennessee, Arkansas, Kentucky and Missouri in June 1983 to locate places to burglarize.

Dyer testified that he and Gene Wilson had visited with Wilson's brother Albert before they had departed on their trip and that Wilson had borrowed a .38 Colt and two other guns at that time. He also recalled that a few days before their departure he and Wilson again visited Albert and that Wilson and Albert's wife had gotten into an argument and Albert had told them to leave.

Dyer testified that a few days prior to the trip Wilson had wielded a gun at defendant after he discovered the defendant reading a letter addressed to Wilson. Dyer also recalled that defendant owed Wilson some money for bailing him out of jail but did not know if defendant had paid Wilson back. Defendant and Dyer helped Wilson move to Effingham, Illinois, in June 1983, a few days before they left on the trip.

Dyer, Wilson and defendant left on their trip in a brown Oldsmobile owned by defendant. Dyer testified that they had been gone for two days and stayed overnight in a motel in Cooksville, Tennessee, and a motel in Missouri located about 10 miles south of Cairo, Illinois. Only defendant and Dyer stayed in the motel the second night; Wilson spent the night at his sister's house in Charleston, Missouri. A room receipt and registration card dated June 26, 1983, from the Sands Motel in Charleston, Missouri, with the apparent signature of "Jack L. Gandy" was admitted into evidence.

Dyer and defendant left the motel around noon the next day at check-out time when Wilson failed to pick them up at the motel. They walked about 10 miles toward Cairo, Illinois, and later that evening

Wilson picked them up along the interstate. Dyer stated that they were traveling north in Illinois and stopped in Cairo or Mounds to get gas and possibly again in West Frankfort.

Dyer recalled that Wilson's credit card had been used to purchase gasoline at some point in the trip. An attendant at a Shell gasoline station in Ullin, Illinois, located on Interstate 57 testified that in June 1983 he worked the 10 to 6 shift. He processed a credit card purchase of gasoline at the station on Clarence E. Wilson's account on June 27, 1983, for a vehicle with Illinois license plate number TFB 88. The credit card invoice was admitted into evidence. A certified copy of the application to the Secretary of State's office for the 1984 Illinois license number TFB 88, issued May 26, 1983, was also admitted into evidence and indicated that the application was submitted by "Jack L. Gandy."

The three also stopped in Anna, Illinois, looking for John Rooney, a friend of Wilson's. They went to the pizza parlor which Rooney owned but he was not there. Rooney testified that Wilson contacted him twice in 1983 about some paintings of Wilson's that he wanted Rooney to sell for him. Rooney recalled that Wilson had last contacted him a short time before he had heard that Wilson had been killed and that Wilson had said he had been by the pizza parlor in Anna but had missed Rooney. Dyer testified that Wilson had also gone to the back door of a music store, possibly to burglarize it, but could not get in. Wilson got wet in the rain in Anna, and Dyer remembered that Wilson changed clothes, putting on some blue jeans, when they last stopped to get gas. Dyer testified that because they were still looking for places to burglarize they were driving on side roads rather than the interstate.

Dyer stated that somewhere in the country after they had passed a sign for West Frankfort, Wilson had asked defendant, who was driving, to stop so that he could urinate. They were on a blacktop road; there were no lights and it was after midnight. Dyer testified that Wilson had been in the front passenger seat and that he had been in the back seat. Wilson and Dyer got out on the passenger side and Wilson left the car door open while he was urinating. Defendant went to the trunk of the car. Dyer realized when he had gone over to the driver's side of the car and defendant passed him walking to the front of the car that defendant had gotten a pistol from the trunk. Dyer testified that defendant then shot Wilson in the back, over the hood of the car. The pistol was the .38 Colt that Wilson had borrowed from his brother. Wilson had been urinating when he was shot, and before

he passed out Dyer heard him say, "I ain't going to rat on you guys," and saw blood come up to his mouth.

Dyer testified that defendant said "let's get him over in the weeds," and Dyer helped defendant drag Wilson into the bushes a few feet away. Dyer backed out of the bushes because he was afraid that defendant would shoot him next, and he saw defendant bending over Wilson when he heard another shot fired. As defendant was walking back up to the car he was wiping his head with a rag and said to Dyer, "that son-of-a-bitch's brains splattered all over my face." Dyer testified that he had no choice but to help defendant move Wilson into the woods because defendant had a pistol. He testified he continued to be afraid because as they drove off defendant kept the pistol between his legs.

Dyer and defendant then drove through Carlyle, Greenville, and Donnelson, Illinois, and took a country road up to Taylor Springs. Dyer testified that by a bridge west of Taylor Springs defendant broke the barrel off the pistol and threw the pistol into the creek. Dyer threw the barrel of the gun into a wooded area past the creek. They also burned Wilson's credit card and driver's license, a shirt and a pair of pants. Defendant dropped Dyer off at his mother's house in Litchfield that morning and told him if he ever told on defendant, he would get his next of kin. Dyer testified that defendant never told him why he had killed Wilson and that he did not know, prior to stopping that night, that defendant had intended to kill Wilson. He testified that defendant had told him in the motel the second night that he should shoot Wilson for pointing the gun at him and that Dyer told defendant to let it slide because Wilson was just mad.

Dyer was afraid to tell the police about the killing for fear that defendant would hurt him or his family. However, in April 1988 after he had learned that defendant was in prison, he gave a statement to Michael Guerin of the Illinois State Police. Dyer had never been charged with the murder of Wilson prior to this time but feared that he could have been charged with murder by accessory. Dyer admitted, however, that Agent Guerin had tried to talk to him in 1984 about Wilson's murder but that he had refused to speak to him at that time.

Dyer, who is currently serving time in Menard Correctional Center, testified that about six months prior to the trial Edward Spicer, leader of the Vice Lords gang, had approached him in the recreation yard and asked him if he hated defendant. Dyer believed that Spicer had been sent by defendant to intimidate him because defendant had at one time mentioned that when he was in Menard penitentiary, he had had some trouble with gang members and he had contacted

Spicer to straighten out the problems. Dyer testified that he never socialized with Spicer and that it was, in fact, unusual for blacks and whites to socialize in prison. Dyer testified that he had never talked to Spicer about the shooting or told Spicer that defendant had not shot Wilson, and he feared retribution from members of the Vice Lords for his testimony in this case. Dyer testified that he had not been promised anything for his testimony and that he had been willing to testify because Wilson had been his friend and the way that he had been killed was cold. The admissible prior record of Clifford Dyer was admitted by stipulation into the record. The stipulation provided that Dyer had convictions in Montgomery County for burglary, armed robbery and armed violence, aggravated battery and forgery between May 1980 and April 1988.

Agent Guerin testified that he had interviewed the defendant in February 1984 about the murder of Clarence Wilson. The defendant was not in custody at that time, and the interview took place at defendant's residence in Litchfield, Illinois. Defendant was advised of and waived his constitutional rights prior to giving a statement to Guerin. Defendant told Guerin that he and Tony Dyer had helped Wilson move from Montrose to Effingham, Illinois, and that thereafter the three had taken defendant's vehicle to southern Missouri for a couple of days to do some fishing. Defendant recalled that they had stayed in a motel but not the name of the town. Defendant did not remember going to the residence of Wilson's relatives in Charleston, Missouri.

Defendant recalled that Wilson had mentioned doing some burglaries in that area but stated that they had not done any burglaries while they were down there. Defendant recalled that Wilson had taken a .38 caliber handgun with him on the trip. Defendant stated that they drove up the Missouri side to St. Louis on their return trip and then from St. Louis to Effingham, where he dropped Wilson and Dyer off at Wilson's apartment. Defendant told Guerin that this was the last time he had seen Clarence Wilson. Defendant also told Guerin that he still owed Wilson $500.

Agent Guerin testified that on September 23, 1983, he prepared a written report concerning the Shell credit card invoice of June 27, 1983, the signature of which appeared as "Clarence E. Wilson," with license number appearing as "TFB 88." The report further stated that Wilson's card was used at the Smoot Oil Company, Interstate 57, Ullin, Illinois. Guerin could not recall whether he had confronted defendant with this information in the February 1984 interview. The State asked the court to take judicial notice, however, that the Sep-

tember 23, 1983, report was furnished to defendant as part of pretrial discovery, according to its compliance pleading filed November 2, 1988.

Agent Guerin testified that he had a second conversation with defendant on March 1, 1989, regarding the circumstances of the death of Clarence Wilson. The interview took place at the Marion County courthouse. Defendant's attorney at that time was present but left prior to the interview. Defendant was again advised of his constitutional rights and signed a *Miranda* waiver form prior to giving his statement. It was witnessed by defendant's attorney, Guerin and Sergeant Gillenwater of the Illinois State Police. Guerin testified that he asked defendant if he understood each segment of the constitutional rights and asked defendant to initial each number indicating that he understood what was being read to him. The "Statement of Constitutional Rights and Waiver" form that was read to and signed by defendant was admitted into evidence without objection.

At the end of the interview Guerin asked defendant to reduce his statement to writing. Defendant told Guerin that if he would write what defendant told him, defendant would then read and sign the statement. Defendant's attorney also read the statement before defendant signed it. Defendant's March 1, 1989, statement was admitted without objection into evidence and was read into the record. In defendant's March 1, 1989, statement he maintained that the return trip from Tennessee and Missouri went north through Illinois and recalled a stop for gasoline in which Wilson used his credit card. Defendant stated that Wilson drove the vehicle to Effingham, where he was dropped off at his apartment. Defendant also stated that he next saw Wilson on July 1 or 2, 1983, and that they had talked at a truck stop in Effingham about the $500 which defendant owed Wilson and which Wilson needed to pay his rent. Defendant stated that he had asked his mother by telephone if she could help out with the money and that his mother told him that she had given Wilson $500 the next evening.

Guerin stated that although defendant's statement did not specify the route taken on the return trip, defendant had told him that they traveled on Interstate 57. An Illinois road map issued by the Secretary of State's office was admitted into evidence. Guerin reported that Interstate 57 begins at the bridge which crosses over from Missouri at Cairo, Illinois, and runs north through Effingham, Illinois, to Chicago. He stated that Interstate 57 does not run through St. Louis, Missouri. He testified that Wilson's body was discovered just north of the Marion County line, near Walnut Hill, Illinois.

Agent Guerin testified that he spoke with Tony Dyer on April 26, 1988, after learning that Dyer wanted to talk about the murder of Clarence E. Wilson. Guerin testified that he did not offer Dyer anything to talk to him other than a grant of immunity for his testimony provided he was not the shooter. Guerin stated that at this point in his investigation of the Wilson murder, the case was at a stalemate. He also stated that they did not have any kind of a case against Dyer at that time. To Guerin's knowledge, Dyer received no leniency from any other agency because of his cooperation in this case. Guerin testified that after Dyer gave his statement in February 1988 he searched the creek and wooded area near Taylor Springs, Illinois, but was unable to locate the butt or barrel belonging to the .38 Colt.

Agent Guerin testified that in his initial investigation of the murder he had spoken with Albert Wilson about his relationship with his brother in May or June of 1983, and that Albert Wilson had admitted that they had had an altercation around June 3, 1983. Guerin never considered Albert Wilson a suspect in the murder because he observed Albert's attitude to be very concerned about finding out who had killed his brother. He also spoke with residents of the apartment building in Montrose, Illinois, where Wilson formerly lived in June 1983, and with Wilson's other relatives. Agent Guerin was unable to find anyone who had seen Clarence Wilson alive after the latter part of June 1983, except for defendant, who maintained in his March 1989 statement that he had last spoken with Wilson on July 1 or 2, 1983.

The director of the housing authority in Effingham, Illinois, testified that she had received rental payments for Clarence Wilson's apartment in Montrose, Illinois, through June 2, 1983. The rental receipts for 1983 which were admitted into evidence showed that Wilson paid his monthly rent early in the month. She also saw Wilson on June 23, 1983, when she did the annual inspection of his housing unit. She discovered a vacant apartment in July 1983 after he had not paid his July rent. The operator of the apartment in Effingham that Wilson had moved into in late June 1983 testified that she had rented the apartment to him on June 23, 1983, and had written him a receipt for two weeks' rent. Wilson made no further rent payments to her and she never saw him again after that date. She testified that she knew the defendant because he used to live in the apartment building and that to her knowledge, defendant's mother had never come to visit Clarence Wilson in June or July 1983. When she packed Wilson's belongings up in July 1983, she found some women's clothes and makeup.

Tina Eve testified for the State that she last saw Clarence Wilson in May 1983 when he brought his pickup truck to her home in Springfield for Eve's husband to work on. Wilson said he would return for the truck in June. Wilson was with Dyer and gave Eve's husband some cartons of cigarettes for working on the truck. Eve was contacted by Albert Wilson after Clarence disappeared and spoke with Agent Guerin in September 1983.

Albert Wilson testified that the last time he had seen his brother was the last part of June 1983 at his house in Greenup, Illinois. His brother was with Tony Dyer, and Albert Wilson stated that his brother considered Dyer his best friend. Albert Wilson testified that he had loaned several weapons to his brother and Dyer earlier in the month of June 1983, including a .38 Colt pistol, and he had never gotten any of the weapons back. He admitted that there had been a disagreement between himself and his brother the last time he had seen his brother because Wilson had struck Albert's wife. Albert Wilson also admitted that he had pushed his brother down. He spoke with his brother two more times on the telephone after that, however, and his brother had apologized for hitting Albert's wife. Albert Wilson had also met defendant but observed that defendant's relationship with his brother was not as close as his brother's relationship with Dyer. When he had not heard from his brother for two weeks he started asking neighbors, family, and his brother's friends if any had seen Clarence Wilson. Dyer suggested that Clarence Wilson may have gone to Canada. He was informed of his brother's death by Agent Guerin on August 23, 1983.

Roy Roper testified for the State that he and defendant had been incarcerated together for 35 days in the Marion County jail, following Roper's driving under the influence (DUI) and revoked probation in March of 1989. Roper testified that when he had first spoken with defendant about his case he believed defendant was innocent. Later, however, on an occasion when he and the defendant were talking about Walnut Hill where Roper used to live, defendant told Roper that he had, in fact, shot Mr. Wilson. Roper testified that defendant said that he, Tony Dyer and Clarence Wilson had come to the Walnut Hill area after getting fuel in Charleston, because Dyer had an ex-girlfriend who lived in the area. Roper testified that defendant said they were partying and had gotten Wilson out of the car and that he had shot Wilson in the chest. Defendant also thought he had shot Wilson another time in the head. Roper stated that he decided to reveal this information to Agent Guerin when he was transferred to the Jefferson County jail in June 1989, because defendant had threatened to

sneak a firearm into the jail and kill Guerin and State's Attorney Hillis. Roper stated that defendant had a grudge against Guerin and Hillis because defendant felt he was being railroaded. Roper was on TASC (Treatment Alternatives to Street Crime) probation since sentencing on the DUI in August 1989 and stated that his probation could be revoked for perjury. Roper's prior admissible convictions in 1986 for theft of a firearm and in 1987 for burglary and theft were admitted by stipulation for purposes of impeachment.

Richard Burkett testified on behalf of defendant that he had been incarcerated with defendant in the Marion County jail in May of 1989. He was there at the same time that Roy Roper was in the jail. They were in cell block 13 together. Burkett testified that defendant had constantly proclaimed his innocence in this case and he had never seen Roper and the defendant speaking alone. Burkett said that defendant was his friend but that he would never commit perjury for him. Burkett's prior admissible conviction in 1989 for aggravated battery was admitted by stipulation for purposes of impeachment.

Edward Spicer testified on behalf of the defendant that he had been incarcerated at Menard Correctional Center with Tony Dyer in 1989. Spicer testified that he had a conversation with Dyer in January 1989 in the yard and that Dyer had told him: that Jack Gandy was in the county jail for killing some old guy named Wilson; that Gandy did not do it; that Dyer did it; and that Gandy was nowhere around when the murder took place. Dyer told Spicer that the three were running buddies and were supposed to be committing burglaries but they were having problems because no one came to get Gandy after Gandy had gotten arrested for a burglary.

In February 1989 Dyer told Spicer that he had refused to talk with Gandy's attorney. Spicer testified that he did not know Jack Gandy and had never met him until the day of trial. He believed that Dyer made his statement against Gandy because he had something personal against him. Spicer found out who defendant's attorney was and sent him a letter concerning Dyer's statement. He also gave a statement to Agent Guerin.

The admissible prior convictions of Spicer from 1976 for murder and armed robbery and 1977 for murder were admitted by stipulation for purposes of impeachment. Spicer admitted that up until a few months ago he had been chief of the Vice Lords gang. Gang members look out for each other in prison, and Spicer admitted that for breaking the rules he had stabbed someone or had someone stabbed in the penitentiary, on more than one occasion. One of the rules was that you do not come into court and testify against a brother. As chief he

had ironed out problems between one of his people and an outsider if he felt it was a good thing to do. Spicer stated that liars were worse than murderers but that he would lie and murder for a friend. He first stated that he was not afraid of being charged with perjury but admitted that he was doing 830 years for four prior murder convictions. In his letter to defendant's attorney he stated that his allegiance was to those who were in the same situation he was in.

Defendant testified on his own behalf that he had never made statements to Roy Roper indicating that he was guilty of murdering Clarence Wilson, and he maintained that Roper committed perjury by his testimony. At no time since his incarceration in the Marion County jail did he ever state to anyone that he was guilty of the murder. Defendant claimed that he kept his papers from the case, including witness statements and police reports, in the top bunk of his cell but that he sometimes had them on the common area table if he was working on them. The admissible prior convictions of defendant were admitted by stipulation for purposes of impeachment. He was convicted in Federal court in 1987 for receipt of a firearm by a felon and in Effingham County in 1983 for theft and the unlawful use of a weapon.

David Hough testified for the defense that he had been incarcerated with defendant and Roy Roper in cell block 13 of the Marion County jail. Defendant always stated his innocence of the murder charge in this case. He never observed defendant talking to Roper about the murder charge against defendant. Hough admitted that defendant was his friend and gave him legal advice about his case. The admissible prior convictions of the witness were admitted by stipulation into evidence. Hough had been convicted in 1989 of aggravated criminal sexual assault.

Bradley James Henken testified on behalf of the defendant that he was a trustee inmate at the Marion County jail when Roy Roper was incarcerated in cell block 14. He had on occasion spoken with defendant about the murder charge pending against him. Defendant had always proclaimed his innocence. He had never heard defendant tell anybody that he was guilty of the charge. Henken admitted that he had written a letter for defendant in which he stated that they had become pretty good friends and that defendant had told him he could live with defendant when they both got out of jail. The prior admissible convictions of Henken were admitted by stipulation for impeachment purposes. Henken was convicted in Marion County in 1989 of theft and in 1988 of forgery and criminal damage to property.

The first issue raised by defendant is whether he was denied his constitutional right to confront witnesses when his counsel did not impeach the State's main witness with a prior perjury conviction. The State argues, however, that defendant has waived this issue because both an objection at trial and a written motion raising the issue are required to preserve even constitutional issues such as the right of confrontation, citing *People v. Helton* (1990), 195 Ill. App. 3d 410, 552 N.E.2d 398, and *People v. Goree* (1983), 115 Ill. App. 3d 157, 450 N.E.2d 342. This court has the authority to notice allegations of plain error or defects affecting substantial rights although they were not brought to the attention of the trial court. (134 Ill. 2d R. 615(a).) Review of issues pursuant to Rule 615(a) only occurs, however, where the evidence is closely balanced or the error denied the defendant a fair trial. (*Helton*, 195 Ill. App. 3d at 418, 552 N.E.2d at 404; *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091, 1094.) Because defendant argues that a finding that Tony Dyer's testimony was credible was key to his conviction for Wilson's murder, and for the purpose of fully treating his entire appeal, we will consider this first issue raised by defendant.

As noted above, Tony Dyer's prior convictions for burglary, armed robbery and armed violence, aggravated battery and forgery were admitted by stipulation for purposes of impeachment of his credibility. As was also noted, these convictions took place since 1980. Defendant notes, however, that Dyer had a prior conviction for perjury in 1975 and that his trial attorney was aware of this fact due to the State's discovery disclosure of this fact prior to trial. This conviction was not offered by the defense as part of Dyer's stipulated prior admissible convictions for purposes of impeachment. The State notes that defense counsel's failure to offer Dyer's 1975 perjury conviction obviously resulted from his acquaintance with the decision of the Illinois Supreme Court in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.

It is a well-established rule in this State that a prior conviction for a crime punishable by death or imprisonment in excess of one year or a crime involving dishonesty is admissible for impeachment of a witness, unless the court determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698.) The Illinois Supreme Court adopted Rule 609 of the then-proposed Federal Rules of Evidence in this landmark opinion, holding that the provisions of the rule should be followed in future cases. Subdivision (b) of the proposed Rule 609 provided that evidence

of a conviction would not be admissible for impeachment purposes if a period of more than 10 years had elapsed since the latter of the date of conviction or the witness' release from confinement. (*Montgomery*, 47 Ill. 2d at 517, 268 N.E.2d at 698.) The supreme court in *Montgomery* also noted the Advisory Committee's comments to proposed Rule 609 wherein certain factors were suggested for consideration by the trial court in exercising its discretion as to whether the prejudicial effect of the evidence of the prior conviction outweighed the probative relevance, to wit, the nature of the crime, nearness or remoteness, the subsequent career of the person, and whether the crime was similar to the one charged. (*Montgomery*, 47 Ill. 2d at 518, 268 N.E.2d at 700.) It was also noted in these Advisory Committee comments that the specific time-limit provision set forth in subdivision (b) "should be construed only as imposing outer limits upon the judge's determination and not as restricting his decision within them." *Montgomery*, 47 Ill. 2d at 519, 268 N.E.2d at 700.

As one court has previously noted, the major change effected by *Montgomery* from earlier Illinois practice with respect to impeachment by prior conviction was to narrow, by imposing a time limitation, the scope of convictions to be admitted. (*People v. Brown* (1978), 61 Ill. App. 3d 180, 183, 377 N.E.2d 1201, 1203.) *Montgomery* has consistently been interpreted as removing discretion from the trial court to admit evidence of a prior conviction for impeachment purposes where the latter of the conviction or release from confinement did not occur within the 10 years preceding the trial. (See *People v. Cox* (1972), 8 Ill. App. 3d 1033, 1034, 293 N.E.2d 727, 728; *People v. Axelson* (1976), 37 Ill. App. 3d 566, 568, 346 N.E.2d 24, 26; *People v. Yost* (1978), 65 Ill. App. 3d 386, 389, 382 N.E.2d 140, 142, *aff'd* (1980), 78 Ill. 2d 292, 399 N.E.2d 1283.) By adopting this rule the supreme court established that if a period of 10 or more years had elapsed since the date of the prior conviction or release of the witness from confinement, whichever is later, the conviction has lost its relevance to the issue of credibility. (*People v. Washington* (1980), 85 Ill. App. 3d 522, 527, 407 N.E.2d 185, 188-89.) It has also been noted that the supreme court adopted this rule to address the legitimate concerns of both the prosecution and the defense in criminal cases (*People v. Kunze* (1990), 193 Ill. App. 3d 708, 728, 550 N.E.2d 284, 298 (Steigmann, J., specially concurring)), and the express language of the rule makes it equally applicable to all witnesses, whether called by the State or the defense. See *People v. Owens* (1979), 69 Ill. App. 3d 599, 603-04, 388 N.E.2d 170, 174 (court rejected defendant's argument that *Montgomery* holding applies only to defendant-witnesses

and not to State's witnesses such that he should have been allowed to impeach a State's witness with a conviction occurring more than 10 years prior to trial); see also *People v. Jacobs* (1977), 51 Ill. App. 3d 455, 366 N.E.2d 1064; *People v. Thomas* (1978), 58 Ill. App. 3d 402, 374 N.E.2d 743.

Defendant argues, however, that because a perjury conviction bears so fundamentally on a witness' credibility, the *Montgomery* rule, when used in a situation in which the witness' credibility is central to the court's decision as it was in the instant case, is violative of defendant's sixth amendment right to confront witnesses. No Illinois case has been offered in support of this proposition, nor have we been able to locate any Illinois case in which either the defendant or the State has successfully argued that there should be any exceptions to the applicability of *Montgomery*'s 10-year time limitation. Defendant cites as additional authority to this court, however, a Michigan case, *People v. Redmon* (1982), 112 Mich. App. 246, 315 N.W.2d 909, which held that a supreme court rule prohibiting the introduction of evidence of convictions more than 10 years old for purposes of impeachment must yield to the sixth amendment right to confrontation where the defendant would be unable to adequately present her theory of defense without such evidence. Defendant argues that this case supports his argument that his constitutional rights were violated when his trial attorney failed to argue that the perjury conviction of Tony Dyer should be admitted, notwithstanding the *Montgomery* rule, in order to preserve his sixth amendment right to confrontation of witnesses.

It is clear that defendant could not argue that the trial court denied defendant his right of confrontation. Indeed, as a foundation for this issue defendant must argue that his trial counsel was ineffective in representing him. In order for defendant to show that he was denied effective assistance of counsel, he must show that his counsel's performance fell below an objective standard of reasonableness, and a counsel's performance will not be found to constitute ineffective assistance under the constitution unless it is shown to be prejudicial to the defendant. (*People v. Enoch* (1988), 122 Ill. 2d 176, 200, 522 N.E.2d 1124, 1137.) Based on the well-established procedure for impeachment of witnesses by prior conviction since the supreme court's landmark decision in *Montgomery*, defendant cannot convincingly argue that his counsel's failure to offer Dyer's 1975 perjury conviction fell below an objective standard of reasonableness. In effect defendant is asking this court to carve out an exception to the rule established in *Montgomery* where the prior conviction is perjury and credibility of the witness is central to the case, by bootstrapping an argument that

trial counsel was ineffective for failing to recognize the existence of this constitutional argument. This we decline to do.

■ First of all, we note that the defendant in the *Redmon* case properly preserved the constitutional issue by arguing to the trial court that her sixth amendment right took precedence over the Michigan rules of evidence and so the prior conviction of her accuser, which was more than 10 years old, should be admitted to impeach the witness' credibility. Second, if any change or exception to the *Montgomery* rule should be made, we believe it should originate from the court which created the rule. Finally, we are not convinced that defendant was prejudiced by his counsel's failure to bring to the trier of fact's attention that Tony Dyer's credibility was further impeached by the 1975 perjury conviction. Admission of the convictions for theft of any type reflected adversely on the witness' honesty and therefore adversely related to Dyer's ability to be truthful under oath (*People v. Spates* (1979), 77 Ill. 2d 193, 202-03, 395 N.E.2d 563, 569), as did admission of Dyer's prior conviction for forgery, which would certainly be categorized as a crime involving dishonesty. Moreover, the prior *felony* convictions not directly related to dishonesty are presumed to relate adversely to the witness' testimonial honesty and veracity. *People v. Warfel* (1979), 67 Ill. App. 3d 620, 624, 385 N.E.2d 175, 178.

We cannot help but conclude that defendant's attempt to introduce the perjury conviction was not for purposes of impeachment but to create an inference with the trier of fact that this witness was again perjuring himself by his testimony in the instant case. We find that defendant's trial counsel was not ineffective for failing to impeach Tony Dyer's credibility with evidence of Dyer's 1975 perjury conviction. Moreover, in light of the rationale behind the *Montgomery* rule's 10-year time limitation, that the outdated conviction has lost its relevance to the issue of credibility, we believe defendant's sixth amendment rights were not violated by his inability to impeach Dyer's credibility with this evidence.

The next issue we shall address is whether the State failed to prove that defendant was guilty beyond a reasonable doubt where the State's main witness linking him to the crime had a motive to lie, he was an accomplice to the crime, and his testimony was contradicted by other evidence. The trial court found that the basic determination for the trier of fact to make in this case was a decision as to the credibility of Tony Dyer, and the court found that Dyer's testimony was credible. We begin by noting that it is the province of the trial court in a bench trial to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to ren-

der its decision accordingly. (*People v. Berland* (1978), 74 Ill. 2d 286, 305-06, 385 N.E.2d 649, 658.) Because the trial court, unlike the reviewing court, was in a position to observe the witness, the reviewing court should not substitute its judgment on these matters unless the proof is so unsatisfactory that a reasonable doubt of guilt appears. (*Berland*, 74 Ill. 2d at 306, 385 N.E.2d at 658.) Defendant argues that the proof was unsatisfactory because Dyer's credibility was thoroughly impeached, because his testimony was without substantial corroboration, because Dyer, as an accomplice, had much to gain from his testimony accusing defendant of the crime, and because he was granted immunity, a motive to lie. We must further note that a reviewing court will not retry defendant when considering a challenge to the sufficiency of the evidence and that the relevant question on review, after viewing the evidence in the light most favorable to the prosecution, is whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845.

■ With regard to impeachment, defendant points to Dyer's testimony that he saw blood in the victim's mouth after defendant shot him from the back, in spite of the fact that Dyer testified it was nighttime and there were no lights on this country road. However, we believe the court could reasonably have believed testimony that such a detail could have been seen at night, considering Dyer's testimony that it "wasn't that dark" and the testimony that Wilson had kept his door on the front passenger side open such that some light could have been coming from the inside of the car. Moreover, that Dyer "conveniently" walked from the passenger side of the vehicle to the driver's side prior to the shooting is of no consequence and does not create an inference of fabrication. Although defendant categorizes the forensic pathologist's testimony that the bullet which entered the victim's back crossed a rib in a "horizontal to slightly downward angle" as inconsistent with Dyer's testimony that defendant shot across the hood of the car, we agree with the State that no such inference can be made, particularly since the the bullet could have been deflected downward by the rib. We therefore do not find Dyer's testimony to have been impeached, other than by way of the stipulated prior-conviction evidence.

■ We must also disagree with defendant's categorization of Dyer's testimony as being without substantial corroboration. While it is true that only Dyer, defendant, and the victim were present when the murder took place, the details of the trip taken by the three as testified to by Dyer, as well as details of the murder, were substantiated

by testimony of other nonbiased witnesses as well as certain documentary evidence, such as the Charleston, Missouri, room receipt and the credit card invoice for the purchase of gasoline in Ullin, Illinois. Albert Wilson, the victim's brother, testified that his brother had borrowed a .38 Colt in June 1983 and the pistol was never returned. The forensic scientist testified that the two slugs recovered from or near the body of the victim were .38 caliber and may have been fired from a Colt revolver. The forensic pathologist testified that the victim had been shot in the back and had received a contact wound to the head. Dyer's testimony of the shooting, particularly defendant's comment after he had shot the victim a second time, was consistent with this forensic evidence. The crime scene technician testified that the victim was wearing blue jeans and the pants were unzipped, which would be consistent with Dyer's testimony that Wilson was urinating when he was shot. Moreover the deputy coroner testified that he discovered the remains of the body in a clump of trees located 15 to 20 feet north of County Line Road. This testimony is consistent with Dyer's testimony that he helped defendant drag the body into the bushes a few feet away.

Moreover, Dyer's testimony that the victim was murdered after midnight the night after they had stayed in Charleston and the same night that they purchased the gasoline by credit card would have fixed his death on June 27 or 28, 1983. No witness testified that he or she saw Mr. Wilson after that date. Wilson failed to pay his July rent, which was shown to have been habitually paid by Clarence Wilson early in the month. In addition, Dyer's statement to the authorities in 1988, as well as his testimony at trial concerning the route taken through Illinois, was consistent with the time and place of the murder. Moreover, the court found that the testimony of Roy Roper was credible. Roper testified that defendant had admitted that he had twice shot Wilson, once in the head, when the three men were "partying" in the Walnut Hill area, and this was consistent with Dyer's testimony as well as the physical evidence of Wilson's murder.

In contrast, defendant's 1984 statement indicated that the three had returned to Effingham, Illinois, from this trip by way of a Missouri route to St. Louis and then east to Effingham, totally bypassing the area where the body was found. His 1989 statement, which was given after he had received the State's discovery document concerning the credit card invoice, indicated that the three had returned to Effingham through southern Illinois, but defendant also indicated in this statement that he had seen Clarence Wilson alive on July 1 or 2, 1983, and had talked with him on this date about the $500 debt he

owed Wilson. Moreover, defendant indicated in this statement that his mother had given Wilson the $500 after this discussion defendant had with Wilson in early July 1983. Defendant did not call his mother to corroborate this information, and the landlord at Wilson's Effingham apartment testified that defendant's mother had not come to visit defendant. The inference is inescapable that defendant's version of the facts was uncorroborated and varied critically between his two statements.

The majority of the defense witnesses, inmates with defendant at the Marion County jail, testified that defendant never proclaimed anything but innocence with respect to Wilson's murder. However, this testimony adds little in the way of corroboration of defendant's story. Although defendant testified in his own behalf, that testimony was limited to refuting Roper's testimony that defendant had admitted the killing and attempted to cast doubt generally on Roper's testimony with testimony designed to create an inference that his court papers, containing details of the murder, could have been seen by Roper.

Defendant's major witness, it would seem, was Edward Spicer, who testified that Dyer told him in January 1989, while the two were in Menard Correctional Center, that it was he and not defendant who had shot Clarence Wilson. The court specifically found Edward Spicer's testimony not to be credible. Spicer admitted that he had been chief of the Vice Lords gang until recently. He admitted that he would kill or have someone killed for breaking the rules. The rules included not testifying against a brother. He admitted that he would lie and murder for a friend. Spicer's cumulative sentence for four separate murders was 830 years, and it would be reasonable to infer that a conviction for perjured testimony would be no deterrent for this witness. In contrast, Roy Roper was currently on a TASC probation, which could have been revoked for a conviction of perjury. Although Spicer claimed not to have known defendant, we find that the court would have been justified in disbelieving this testimony because Spicer's stated motive for testifying in favor of this "stranger" was that defendant was in the same situation that he was in. Moreover, the court specifically found it to be unlikely that Dyer, who knew he was the State's witness in the pending case against defendant, would tell Spicer that it was he, and not defendant, who had killed the victim.

■ While we agree with defendant that the uncorroborated testimony of an accomplice must be carefully scrutinized (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291, 292), we must disagree with defendant's categorization of Dyer as an accomplice in Wilson's

murder. An accomplice is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of a crime. (*People v. Hoffstetter* (1990), 203 Ill. App. 3d 755, 769, 560 N.E.2d 1349, 1358.) There was no evidence that Dyer took part in Wilson's murder, only that he helped conceal the body, weapon, and personal effects following commission of the crime. Moreover, the victim's brother testified as to Dyer's friendship with Clarence Wilson, and there was no evidence of any intent or motive on Dyer's part to kill Wilson. In contrast, Albert Wilson testified that defendant and his brother did not appear to have as close a relationship, and defendant himself admitted in both statements to have owed Wilson $500 in June 1983. Dyer also testified that defendant was angry with Wilson for waving a gun in his face after Wilson found him reading Wilson's letter. Interestingly, Edward Spicer testified that the three had had a falling out after defendant had been charged with burglary because "no one had come to get him." The court could have inferred from this testimony, as a whole, that defendant had a motive to kill Clarence Wilson and that Tony Dyer did not.

■ Defendant also argues that Dyer's testimony is suspect because he was granted immunity and therefore had a motive to lie. Agent Guerin testified that there was no case against Dyer for Wilson's murder at the time Dyer came forward in 1988 with his statement and that the case was at a stalemate. The only immunity promised Dyer was limited to an absence of any evidence that he was the "shooter" with regard to Wilson's death. Although defendant contends that Dyer expected to receive leniency with regard to the 30-year sentence he was serving in another case, there is no evidence that such leniency was promised to Dyer. Agent Guerin denied that any leniency had been promised by any agency to Dyer and testified that the only preferential treatment he would recommend might be a transfer of the witness away from Edward Spicer. Moreover, review of Dyer's stipulated prior convictions indicates that he was convicted of burglary in 1987 and was already sentenced at the time he came forward with his statement in April 1988.

We find the evidence more than sufficient to support the finder of fact's credibility determinations in the instant case. We further find that the court, as finder of fact in the instant case, could reasonably have found that the evidence, viewed in a light most favorable to the prosecution, supported a finding of defendant's guilt of the murder of Clarence Wilson beyond a reasonable doubt.

The next issue defendant brings by way of his direct appeal is whether the circuit court erred in finding that the offense was accom-

panied by "brutal and heinous behavior indicative of wanton cruelty" to support the imposition of an extended-term sentence. Because the murder took place in June 1983, the applicable sentencing law for this offense was governed by sections 5—8—1 and 5—8—2 of the Unified Code of Corrections (Code) as they existed in 1983. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1, 1005—8—2.) Section 5—8—1(a)(1)(a) of the Unified Code of Corrections provided, in pertinent part, that the sentence of imprisonment for murder shall be a term "not less than 20 years and not more than 40 years." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(a).) Defendant was sentenced under section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2) to an extended term of 50 years' imprisonment. The range of permissible prison sentences for murder under this section of the Code was not less than 40 years and not more than 80 years, and this section provided and still provides that an extended-term sentence shall not be imposed unless the factors in aggravation set forth in paragraph (b) of section 5—5—3.2 are found to be present. (See Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—2(a)(1), 1005—5—3.2(b).) Under this provision, an extended-term sentence may be imposed when the defendant has been convicted of a felony and the trial court finds that the crime was accompanied by exceptionally brutal or heinous behavior. Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2).

Defendant argues that Clarence Wilson's murder was not exceptionally brutal and heinous or indicative of wanton cruelty. Defendant further argues that the trial court relied on an improper factor in aggravation in imposing the 50-year extended-term sentence on him for Wilson's murder. Accordingly, defendant requests that this court exercise its power under Supreme Court Rule 615(b) (134 Ill. 2d R. 615(b)) to reduce the extended-term sentence to a nonextended sentence or, in the alternative, that this court remand the cause for a new sentencing hearing with instructions that an extended-term sentence not be imposed.

We note that because the sentencing judge is in the best position to consider matters relating to sentencing determinations and is vested with wide discretion in making a reasoned judgment as to the penalty appropriate to the particular circumstances of each case, the judge's ultimate sentencing decision will be entitled to substantial weight and deference. (*People v. Center* (1990), 198 Ill. App. 3d 1025, 1032, 556 N.E.2d 724, 728.) Nonetheless, this court has the power and authority under Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) to reduce a sentence imposed by the trial court where it is found to have constituted an abuse of discretion. (*Center*, 198 Ill. App.

3d at 1032, 556 N.E.2d at 729.) An abuse of discretion may be found, even if the sentence is within the statutory limitations, if such sentence is greatly at variance with the purpose and spirit of the law. (*Center*, 198 Ill. App. 3d at 1032, 556 N.E.2d at 729.) While the statutory classification of the crime determines the range of permissible sentences, the severity of the sentence within that range depends largely upon the degree of harm caused. (*Center*, 198 Ill. App. 3d at 1033, 556 N.E.2d at 729.) Under our constitution, all penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, §11.) This requires a balancing between the interest of protecting society and the possibility of rehabilitation of the offender. *People v. Bryant* (1982), 105 Ill. App. 3d 285, 292, 434 N.E.2d 316, 321.

At the December 22, 1989, sentencing hearing defendant presented the testimony of Richard Stone, corrections officer for the Marion County sheriff's department. Stone testified that he had been a corrections officer at the Marion County jail for the entire period of time that defendant had been incarcerated prior to trial and sentencing, a period in excess of one year at that point in time. Stone was able to observe defendant's behavior and conduct on a daily basis during this period of time and stated that defendant had an excellent attitude with other inmates, was cooperative with the corrections officers, and has had no bad conduct, that Stone was aware of, during the period of his incarceration. Defendant also offered in mitigation letters from the president/business manager and the secretary/treasurer of the Construction and General Laborers Union, District No. 25, in Westchester, Illinois, which stated that defendant was a member in good standing of the local since August 1985, that defendant's work record was good, and that the union would be willing to place defendant to work again, without hesitation.

The court also heard argument from counsel with regard to the sentencing alternatives. The State argued that under section 5—8—1 the normal sentencing range was 20 to 40 years' imprisonment, but there was a possibility for an extended term or a sentence for natural life where the court found that the offense was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty. The State noted as aggravating factors that defendant's conduct caused serious harm and that defendant had a prior history of criminal activity, including convictions in 1983 and 1985, after the murder, involving weapons possession. The State contended that defendant's statement to Dyer that he should shoot Wilson for waving the gun

indicated premeditation for the shooting. Moreover, the motive for the shooting was an argument that had taken place a few days earlier and the fact that defendant owed the victim some money. The fact that defendant shot the victim the second time indicated that defendant believed the first shot had not been fatal, and the second shot was delivered in a cold-blooded and merciless fashion as a contact wound, fired point-blank into the skull. Defendant's remarks after firing the exceptionally brutal second shot indicated that defendant enjoyed the killing and expressed no remorse. The State pointed out that defendant methodically disposed of the evidence of the killing and then threatened Dyer and his family if Dyer said anything about it. Finally, the State argued that none of the statutory factors of mitigation were applicable. The State requested imposition of an extended-term sentence of 80 years in the Department of Corrections, for the protection of the public.

Defendant argued that the crime of murder is inherently violent and brutal in nature and so this aspect of the offense is taken into account in the 20- to 40-year normal sentencing range stated in section 5—8—1. Defendant urged that it was only where the circumstances of the crime were *exceptionally* brutal and heinous that the court would be justified in exceeding the normal penalty range. Defendant argued that there was no evidence of torture or that the victim suffered either mental or physical anguish during his death or that the victim even knew of the fatal blow. The medical evidence indicated that both shots were fatal, that the first shot placed the victim in a state of shock and that the second shot could have been described as an act of humanity in the sense that the victim was not left to a lingering death. Defendant argued that there was little or no evidence of premeditation and no evidence that the shooting was in the heat of passion. Defendant also pointed out that the victim in the instant case was not innocent, unlike the victims in the cases cited by the State in support of an extended term. Defendant concluded that this was a proper case for a standard term penalty and noted defendant's good attitude while incarcerated prior to trial, that he was a good worker throughout his life and that he had no prior history of violent crime. Defendant stated that the offenses involving firearms were for their possession, not use against others, and stated that there was no showing that defendant had a propensity for misconduct. Defendant also asked that his age of 51 years be considered in determining sentence and stated that any sentence in excess of 20 years would, in effect, be the imposition of a life term. Defendant gave a statement in his own behalf in which he argued that Dyer was lying and he was not guilty.

The supreme court noted in *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, that "heinous" is defined as "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal"; "brutal" includes "grossly ruthless," "devoid of mercy or compassion: cruel and cold-blooded." (*La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.) The court therefore rejected the defendant's argument therein that in order to impose a natural-life imprisonment sentence where conduct is "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), there must be evidence that the defendant had inflicted torture or unnecessary pain upon his victim. (*La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.) Although a single act which causes death or injury may be sufficient to demonstrate the existence of wanton cruelty, a court, in evaluating the brutality or heinousness of a defendant's conduct, must consider all of the factors surrounding the incident in question. (*People v. Hickman* (1986), 143 Ill. App. 3d 195, 205-06, 492 N.E.2d 1041, 1049.) In determining whether a defendant's conduct is indicative of wanton cruelty, courts have properly examined whether the offense was premeditated and committed with cold-blooded deliberation (*Hickman*, 143 Ill. App. 3d at 206, 492 N.E.2d at 1049), whether the murder was planned and carried out in a dispassionate and calculated manner and the motive behind it demonstrates a lack of regard for human life (*People v. Fyke* (1989), 190 Ill. App. 3d 713, 722, 546 N.E.2d 1101, 1107), whether the defendant exhibited a lack of remorse or lack of a penitent spirit (*Hickman*, 143 Ill. App. 3d at 206, 492 N.E.2d at 1049), whether there was an absence of any immediate provocation by the unarmed victim (*People v. McGee* (1984), 121 Ill. App. 3d 1086, 1091, 460 N.E.2d 843, 847), as well as whether the shooting was at such close range that it will obviously result in death or grave and permanent injury to the victim (*McGee*, 121 Ill. App. 3d at 1091, 460 N.E.2d at 847).

■ The court found in imposing the extended-term sentence of 50 years' imprisonment on defendant that there were no statutory factors of mitigation present as specified in section 5—5—3.1 (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.1), and the court did not find as a factor in aggravation that defendant's conduct caused or threatened serious harm (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2) because this is inherent in the crime of murder. However, after reviewing defendant's presentence report, the court did find as an aggravating factor that the defendant had a history of prior delinquency or criminal activity. See Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(3).

The court rejected defendant's argument that this was an "ordinary" murder and agreed that the evidence supported a finding that the murder was premeditated and coldly and calculatedly committed, not the result of passion or provocation on the part of the victim, and without any good reason. The court dismissed defendant's argument that the second shot to the head was "merciful" and stated that the killing was an execution and that there was no indication of any revulsion or remorse on defendant's part following the killing.

Although defendant argues that it was error for the court to have considered defendant's lack of remorse, citing *People v. Evans* (1986), 143 Ill. App. 3d 236, 492 N.E.2d 1036, the supreme court has held that remorse or its absence is a proper subject for consideration at sentencing. (*People v. Barrow* (1989), 133 Ill. 2d 226, 281, 549 N.E.2d 240, 265.) As noted above, lack of remorse or penitent spirit for his conduct is properly considered in determining whether a defendant's conduct is indicative of wanton cruelty. (*Hickman*, 143 Ill. App. 3d at 206, 492 N.E.2d at 1049.) We find *Evans* distinguishable from the instant case because in *Evans* the reviewing court found that the trial court placed undue emphasis on defendant's lack of remorse, defendant did not have a significant history of criminal behavior, and the amount of controlled substance defendant was found guilty of possessing with intent to deliver was only slightly in excess of the minimum required to make the offense a Class X as opposed to a Class 1 felony. The *Evans* court found an abuse of discretion, based on the above-stated analysis, for an imposition by the trial court of an extended sentence. (*Evans*, 143 Ill. App. 3d at 242, 492 N.E.2d at 1040-41.) In contrast, the sentencing court in this case considered a multitude of factors, including but not limited to lack of remorse, in reaching its determination that the offense was accompanied by brutal and heinous behavior indicative of wanton cruelty.

The circuit court noted that although case law may show murders which were more heinous or brutal by degree, this was a proper case for an extended term. We find neither error nor abuse of discretion on the circuit court's part in its well-reasoned imposition of a 50-year term sentence.

The last issue in this case was presented by separate appeal following the dismissal of defendant's post-conviction relief petition. Defendant filed his *pro se* petition on August 31, 1990, pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401). The State filed a motion to dismiss defendant's petition stating as grounds therein that the allegations of the petition did not constitute any substantial denial of the defendant's constitu-

tional rights which denied defendant a fair trial or substantially affected the outcome of trial as required under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*).

Section 2—1401 of the Code of Civil Procedure provides that relief from final orders and judgments, after 30 days from the entry thereof, may be had upon petition as provided in this section. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401.) In contrast, the Post-Conviction Hearing Act provides that any person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both may institute a proceeding under this article. (Ill. Rev. Stat. 1989, ch. 38, par. 122—1.) A section 2—1401 petition for relief from final judgment is the forum in a criminal case in which to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and court at the time of trial, which, if then known, would have prevented the judgment. (*People v. Berland* (1978), 74 Ill. 2d 286, 313-14, 385 N.E.2d 649, 661-62 (supplemental opinion on denial of rehearing).) Where the section 2—1401 petition is prepared *pro se* and alleges a deprivation of constitutional rights cognizable under the Post-Conviction Hearing Act, the trial court is to treat it as such. (*People v. Riley* (1976), 40 Ill. App. 3d 679, 681, 353 N.E.2d 40, 41-42, citing *People ex rel. Palmer v. Twomey* (1973), 53 Ill. 2d 479, 292 N.E.2d 379.) Because defendant alleged in his petition both that the court's judgment had been based on false facts and that his constitutional rights had been violated, the court properly considered the petition to have been brought pursuant to both the section 2—1401 relief from judgment provision in the Code of Civil Procedure and the provisions of the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*).

Defendant alleged in his petition that his constitutional right to a fair trial had been violated because his March 1, 1989, statement given to Agent Guerin was a product of both coercion and ineffective assistance of counsel. Defendant was represented at the time by a different attorney than his trial counsel. Defendant alleged that it was this attorney who convinced defendant that he should give a statement to Agent Guerin, that defendant did not believe that it was in his best interests to talk to Guerin, but because defendant was at the time taking the prescription drug Elavil, he was unable to resist his attorney's persuasion or act knowingly or voluntarily. Defendant's constitutional rights were violated, he concluded, because the March

1, 1989, statement was taken in violation of his fifth amendment right against self-incrimination.

Defendant further alleged that his trial counsel was ineffective for failing to present evidence to refute Tony Dyer's statement that Edward Spicer had a motive to testify falsely for defendant because Spicer and defendant had become friends while incarcerated together. Defendant contended in his petition that evidence of prison records of both defendant and Spicer would have conclusively shown that the two men had never been incarcerated at the same prison together and therefore would have bolstered Spicer's testimony and contradicted Dyer's testimony.

The circuit court granted the State's motion to dismiss following a hearing held on November 30, 1990. In ruling on the State's motion, the court found that defendant had not presented any fact that had not been brought out at the time of trial or something that had not been known by defendant at the time of trial. The court further found that if the alleged "new" facts had been presented at trial, it would not have changed the outcome of the trial. The court also found, with respect to the Post-Conviction Hearing Act, that there had been no showing in the petition of a substantial denial of any constitutional right under either the United States or Illinois Constitutions and that nothing was alleged which would have affected the outcome of the ruling of the court in this bench trial. The issue presented to this court is whether defendant was improperly denied an evidentiary hearing on the allegations set forth in his post-conviction relief petition because the court erred in dismissing the petition.

■ We agree with the court in the instant case that, with respect to defendant's entitlement to an evidentiary hearing concerning the prison records of Edward Spicer, such evidence would have been cumulative and would not have changed the outcome of the trial. We note that during the trial Edward Spicer denied knowing defendant or ever having met defendant. In contrast, Tony Dyer testified that he believed Spicer was sent to intimidate him because he had recalled defendant once telling him that when defendant had been in Menard prison, he had contacted Spicer to help him straighten out problems with Vice Lord gang members. The inference to be drawn from this testimony is not that defendant and Spicer were in prison together, and therefore Spicer was lying, but that *Dyer believed* that defendant somehow had access to communications with Spicer. Thus, presentation of the prison records of Edward Spicer, intended to prove that the two men were not in prison together and therefore Dyer was lying, would have no effect upon

the inference actually drawn by the court at trial with regard to Dyer's belief based upon what he had been told by defendant. Moreover, this evidence would have been cumulative because Spicer had already testified that he had never met defendant. We also note that the court at the hearing on the State's motion to dismiss found that introduction of this evidence would not have changed its judgment, as the trier of fact, of conviction for the defendant. Where the petition allegations and supporting documents are cumulative and would not have prevented the judgment rendered beyond a reasonable doubt, their presentation will not present a basis for relief under section 2—1401 of the Code of Civil Procedure. (*Berland,* 74 Ill. 2d at 316, 385 N.E.2d at 663.) There was no error in dismissing defendant's petition on this basis.

With regard to the second asserted grounds for error in dismissing defendant's petition, we note that in order to obtain a hearing under the Post-Conviction Hearing Act the defendant must make a substantial showing that his constitutional rights have been violated, and the burden is on the petitioner to set forth the violations and support the allegations with affidavits, records, or other evidence containing specific facts. (*People v. Dillard* (1990), 204 Ill. App. 3d 7, 9, 561 N.E.2d 1219, 1220.) Such showing, however, must be based on factual allegations rather than conclusional statements. (*People v. Sawyer* (1971), 48 Ill. 2d 127, 131, 268 N.E.2d 689, 692.) However, the trial court must hold a hearing to determine actual facts, under the Post-Conviction Hearing Act, if the allegations and supporting documents, if true, would establish a constitutional violation. (*Dillard,* 204 Ill. App. 3d at 9, 561 N.E.2d at 1220.) We note that a confession which is induced by administration of a drug, whether self-administered or otherwise, may be found to be involuntary and inadmissible into evidence where the trial court ascertains that the accused's will was overborne at the time of the confession, and a confession obtained under such circumstances is violative of the due process clause of the fourteenth amendment. See *People v. Kincaid* (1981), 87 Ill. 2d 107, 117-19, 429 N.E.2d 508, 511-13.

■ We also note, as to the voluntariness of defendant's March 1, 1989, statement to Agent Guerin, that defendant would have known at the time of the statement and at the time of his direct appeal herein that he had been using this prescription drug. He therefore could have raised the involuntariness issue in a pretrial motion to suppress, objected to its admission during Agent Guerin's testimony, or even raised its admission as error as late as a posttrial motion and his direct appeal, by relying on the doctrine of

plain error. (See *People v. Hickman* (1986), 143 Ill. App. 3d 195, 203, 492 N.E.2d 1041, 1047.) Thus, the State argues that the issue of the voluntariness of defendant's statement was waived by defendant because it was not raised at trial. We agree.

A proceeding under the Post-Conviction Hearing Act is not an appeal but is a collateral attack on a judgment, requiring a sufficient allegation of a violation of constitutional rights which would entitle the defendant to post-conviction relief. (*People v. James* (1986), 111 Ill. 2d 283, 290-91, 489 N.E.2d 1350, 1353.) The alleged ineffective assistance of counsel was based upon purported evidence the substance of which was known to defendant and therefore could have been raised at trial or on appeal. We must therefore agree with the court in the instant case that there was no showing in the allegations of the petition that defendant's constitutional rights had been violated by admission of this statement.

Defendant would have to have alleged that he had made known to his trial attorney, or that the attorney had learned from other sources, that defendant had been under the influence of the drug Elavil and that it interfered with his capacity to make a knowing decision about speaking with Agent Guerin, in order to sufficiently allege in the post-conviction relief petition that his counsel was ineffective in failing to move for suppression of the statement. In the alternative, defendant would have to have alleged that he had exhibited outward signs of incompetence due to his use of the drug Elavil, on March 1, 1989, in order to sufficiently allege that his pretrial attorney was ineffective because he had coerced defendant into speaking with Agent Guerin against defendant's will. Defendant noted in his brief that the drug Elavil can cause a multitude of mood-altering behaviors such as confusional states, disturbed concentration, disorientation, delusions, excitement, anxiety, restlessness, nightmares, weakness, fatigue, headaches, and drowsiness, citing *Physicians Desk Reference* 1286-88 (41st ed. 1987) and attaching this reference as a supplement to his brief. However, defendant failed to attach medical records from this time period, or affidavits of prison personnel or anyone who might have witnessed aberrant behavior on defendant's part at this time period, in support of his *conclusion* that he was incapable of giving a knowing consent to waive his constitutional rights and speak with Agent Guerin.

Interestingly, Agent Guerin testified that defendant was read his rights, signed a *Miranda* waiver, and was asked if he understood each segment of the constitutional rights on the "Statement

of Constitutional Rights and Waiver" form which was read to him, and that defendant initialled each number indicating that he understood what was being read to him. Moreover, both defendant and his attorney read the statement defendant had dictated to Agent Guerin before defendant signed it. Defendant did not contradict this testimony that defendant's statement was voluntary and knowing, by any allegation, affidavit or record in his petition.

The court's dismissal of a post-conviction petition without an evidentiary hearing will not be reversed on appeal absent an abuse of discretion. (*People v. Barr* (1990), 200 Ill. App. 3d 1077, 1081, 558 N.E.2d 778, 781.) We also note that claims of ineffective assistance of counsel reach constitutional dimension only if such representation probably affected the outcome of the trial, and it is the burden of the defendant to so demonstrate. (*Barr*, 200 Ill. App. 3d at 1081, 558 N.E.2d at 781.) The circuit court specifically found that nothing was alleged in this regard which would have affected the outcome of its ruling in this bench trial. We hold that the circuit court did not abuse its discretion in dismissing defendant's petition for post-conviction relief and refusing to grant defendant an evidentiary hearing because defendant failed to meet his burden of setting forth a constitutional violation and supporting that allegation with affidavits, records or other evidence.

For the above-stated reasons, we affirm the circuit court of Marion County's November 15, 1989, judgment of conviction and November 30, 1990, order dismissing defendant's post-conviction petition.

Affirmed.

GOLDENHERSH, P.J., and HARRISON, J., concur.